1325 North Van Buren, LLC,
Plaintiff-Appellant,

v.

T-3 Group, Ltd., Westport Insurance Corporation††
and Indiana Insurance Company,
Defendants-Respondents,†

Racine Building Supply, LLC, and
Federal Insurance Company,
Defendants.

Court of Appeals

*No. 2004AP352. Oral argument January 4, 2005.
—Decided May 17, 2005.*

**2005 WI App 121**

(Also reported in 701 N.W.2d 13.)

---

† Petition to review granted 10-3-05.
†† Petition for cross review granted 10-3-05.

---

388

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Kimberly A. Hurtado* and *Elizabeth M. Roat* of *Hurtado, S.C.*, of Milwaukee, and *Patrick O'Connor, pro hac vice*, of *Faegre & Benson*, of Minneapolis, Minnesota, with oral argument by Patrick O'Connor.

On behalf of the defendant-respondent T-3 Group, Inc., the cause was submitted on the brief of *David J. Hanus* of *Hinshaw & Culbertson, LLP*, of Milwaukee, and *Lawrence J. Drabot* of *Crivello, Carlson & Mentkowski, S.C.*, of Milwaukee, with oral argument by David J. Hanus and Lawrence J. Drabot.

On behalf of the defendant-respondent Indiana Insurance Company, the cause was submitted on the brief

of *Jeffrey A. Schmeckpeper* and *Matthew W. Moran* of *Kasdorf, Lewis & Swietlik, S.C.*, of Milwaukee, with oral argument by Jeffrey A. Schmeckpeper.

On behalf of the defendant-respondent Westport Insurance Corporation, the cause was submitted on the brief of *Vincent P. Tomkiewicz* and *George J. Manos* of *Bollinger, Ruberry & Garvey*, of Chicago, Illinois, with oral argument by Vincent P. Tomkiewicz.

Before Fine, Curley and Kessler, JJ.

¶ 1. CURLEY, J. 1325 North Van Buren, LLC (1325) appeals from the trial court's grant of: (1) summary judgment in favor of Indiana Insurance Company, on the basis of the economic loss doctrine, dismissing all of 1325's coverage claims against Indiana and negligence claims against T-3 Group, Ltd., and (2) declaratory judgment in favor of Westport Insurance Corporation, dismissing all of 1325's claims against Westport and declaring that Westport has no obligation to defend or indemnify the insured, T-3, against 1325's claims in the matter. 1325 contends that the trial court incorrectly applied the economic loss doctrine to dismiss its negligence claims and erroneously ruled that T-3 had no insurance coverage arising from such claims. In regard to Indiana, 1325 argues that the commercial general liability (CGL) policy provides coverage for the contract claims 1325 asserted against T-3 for property damage and loss of use caused by its subcontractors. Finally, 1325 insists that the trial court erred in declaring that Westport has no obligation to defend or indemnify T-3, under the professional liability policy, in regard to 1325's claims that T-3 inadequately provided professional services, and dismissing 1325's claims against Westport.

¶ 2. Because the economic loss doctrine does not apply in this case, as the relevant agreement was a contract for services, to which the economic loss doctrine is inapplicable under *Insurance Co. of North America v. Cease Electric Inc.*, 2004 WI 139, 276 Wis. 2d 361, 688 N.W.2d 462, we conclude that the trial court erred in dismissing all of 1325's negligence claims against T-3. We also conclude that although 1325's claims trigger coverage under the Indiana policy, there are exclusions in the policy that may preclude coverage, though the extent to which that is the case presents factual issues for determination on remand. With regard to 1325's claims against Westport, we conclude that the professional liability policy does require Westport to defend and indemnify T-3 against 1325's claims concerning T-3's failure to provide adequate professional services. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## I. BACKGROUND.

¶ 3. In March 2001, 1325 entered into a contract with T-3 for the purpose of renovating an existing industrial warehouse building into a forty-two unit condominium building with attached parking garages. Essentially, T-3 was to provide professional construction management and administration services and hire subcontractors to renovate the building and complete the project. The contract would have yielded over $6 million dollars to T-3. Pursuant to the agreement, T-3 was to maintain $2 million of commercial general liability coverage for the project. It secured this coverage from Indiana. In addition, T-3 secured professional liability coverage for its construction management services from Westport.

395

¶ 4. Unfortunately, the construction project did not go as planned. There were numerous accidents and setbacks, and the project did not proceed according to schedule. As a result, 1325 fired T-3 and filed a lawsuit alleging claims in both tort and contract. In its second amended complaint, 1325 alleged several causes of action, against multiple defendants, including: breach of contract; negligence in carrying out professional responsibilities; negligent misrepresentation; intentional misrepresentation; slander of title; failure to indemnify and/or defend against construction liens; theft by contractor; and claims for insurance coverage.[1]

¶ 5. Indiana moved for declaratory and summary judgment on the pleadings, asking the trial court to declare that Indiana has no duty to defend and indemnify T-3 against 1325's claims because they are not covered or are excluded by the policy. The trial court determined that the second and tenth causes of action—a negligence claim and coverage claim—were "sufficiently [pled] so as to trigger Indiana's duty to defend[,]" and that neither the doctrine of economic loss nor any of the exclusions bar coverage under the policy.

¶ 6. Thereafter, Indiana again filed for summary judgment, alleging that pretrial discovery revealed that "the pertinent exclusions in the Indiana policy act to bar coverage for all damages[,]" and, moreover, "the economic loss doctrine mandates that the damages claimed can only be recovered under a contract theory[,]" and as such, the negligence claims must be dismissed. T-3 also filed a motion for partial summary

---

[1] T-3 counterclaimed, but subsequently dismissed all of the causes of action in its counterclaim by stipulation. 1325 also subsequently dismissed, by stipulation, its intentional misrepresentation, slander of title, failure to defend and indemnify subcontractor liens, and theft by contractor claims.

judgment contending that, absent damages for personal injury or property damage to property beyond the subject matter of the contract between 1325 and T-3, 1325's tort claims for negligence and negligent misrepresentation are barred under the economic loss doctrine. T-3 also insisted that it could not be held vicariously liable for the tortious conduct of the independent subcontractors. The trial court granted both T-3's motion for partial summary judgment[2] and Indiana's motion for summary judgment, concluding that the economic loss doctrine applied:

> The purpose [of the economic loss doctrine], as we know, is to maintain the fundamental distinction between tort law and contract law, to protect commercial parties' freedom to allocate economic risk by contract, and to encourage the parties best situated to assess the risk of economic loss, the commercial purchaser to assume and allocate or insure against the risk.
>
> . . . .
>
> Now, the Court has reviewed all the law that has been provided, and I'm particularly persuaded by the reasons of *Bay Breeze Condo Association*, 651 North-

---

[2] 1325 has appealed only the final judgments dismissing Indiana and Westport from the action, and thus the underlying orders granting summary and declaratory judgment to those two parties. The order granting T-3's motion for partial summary judgment was not final, and 1325 has thus not appealed from that order. T-3 moved to intervene in this appeal with regard to the applicability of the economic loss doctrine. That motion was granted. Thus, T-3 is only a party to this appeal on the limited issue of the applicability of the economic loss doctrine. Any argument regarding any other portion of T-3's motion for partial summary judgment, including any argument pertaining to 1325's alleged election of liquidated damages, is not properly before this court on appeal.

west 2d 738, and several cases that follow this, that the integrated system rule, which holds that once a party becomes integrated into a completed project or system, the entire project or system ceases to be other property for the purpose of the economic loss doctrine applies here.

And also *Wausau Paper Mills*, at 789 Federal Supplement 968, states that the economic loss doctrine precludes tort recovery for economic loss where there is [a] contractual relationship between two sophisticated parties, regardless of whether the contract is for products or service. . . .

And based on the reasoning of these cases and the arguments put forth by counsel, the Court agrees with T-3 that there is a bar to tort claims under this – under the claims – under the particular circumstances and facts of this case, and that the economic loss doctrine would apply, and that the motion of Indiana Insurance under the economic loss doctrine would also be granted.

. . . .

I'm not going to get into the areas of contract exclusions, because I believe those issues are moot.

Accordingly, all of the tort claims alleged by 1325 against T-3 were dismissed. As such, the only claim that remained was for breach of contract.

¶ 7. Soon thereafter, Westport filed a motion for declaratory relief contending that "[t]he Westport policy insures for legal liability imposed as a result of tort and negligence claims – there is no coverage for breach of contract[,]" and "since the only remaining claim is for breach of contract, Westport is entitled to declaratory relief that it has no duty to defend or indemnify for the sole remaining claim." Westport insisted that the policy provided professional liability insurance to T-3 for

losses relating to legal liability incurred by T-3 as a result of negligent acts, errors and omissions, and the policy required third-party liability arising out of tortious conduct, "that is, conduct for which there is a duty, breach of the duty and damages to a third-party." As such, Westport argued that 1325's claim against T-3 for breach of contract was not covered by the policy. The trial court agreed, concluding:

> Reviewing all the materials that have been provided by both sides and the arguments that have been presented today, I think that the position of Westport is well supported in Wisconsin law and in the [S]eventh [C]ircuit, that the – they have no obligation under a tort claim, and that the policy excludes cost to repair and replace faulty workmanship.

> And ultimately, that is what we have here. We have a contract claim for a product that was not received in the manner in which it was inspected [sic], pursuant to the contract, and that is not – that is – not what this policy was – was set to recover – was – the coverage this policy can take.

> The coverage doesn't extend to business risks, and that an insurance coverage of this sort can't be a performance bond for any claim, no matter how you couch it – whether you say the underlying facts are negligent or not, it can't cover every possible thing that you – manner in which you draft your complaint.

> We look at the complaint. As it stands now, it's contract. The insurance policy does not cover contract. I am convinced and persuaded by that argument.

> . . . .

> And the Court is persuaded that Westport's policy is not – excludes coverage for faulty workmanship and

excludes coverage for contract claims, and their request to be dismissed from the action is granted[.]

1325's claims against T-3's professional liability insurer, Westport, were thus dismissed.

¶ 8. As indicated above, the trial court dismissed all of 1325's negligence claims against T-3, in addition to all of its claims against both of T-3's insurers. On appeal, 1325 argues that: (1) the trial court incorrectly applied the economic loss doctrine to dismiss 1325's negligence claims against T-3, and erroneously ruled that T-3 has no insurance coverage arising from such claims; (2) Indiana's CGL policy provides coverage for contract claims asserted against T-3 for property damage and loss of use caused by its subcontractors; and (3) Westport's professional liability policy provides coverage for 1325's breach of contract claims that T-3 inadequately provided professional services.

## II. ANALYSIS.

¶ 9. In an appeal from the entry of summary judgment, this court reviews the record *de novo,* applying the same standard and following the same methodology required of the trial court under WIS. STAT. § 802.08. *See Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). That methodology is well known, and need not be repeated here. *See* § 802.08; *Grams v. Boss,* 97 Wis. 2d 332, 338–39, 294 N.W.2d 473 (1980).

¶ 10. "A decision to grant or deny declaratory relief falls within the discretion of the circuit court." *Milwaukee Dist. Council 48 v. Milwaukee County,* 2001 WI 65, ¶ 36, 244 Wis. 2d 333, 627 N.W.2d 866. However,

when the exercise of such discretion turns upon a question of law, we review the question *de novo,* benefiting from the trial courts analysis. *Gulmire v. St. Paul Fire Marine Ins. Co.*, 2004 WI App 18, ¶ 10, 269 Wis. 2d 501, 674 N.W.2d 629.

¶ 11. Indeed, "[i]nterpreting the nature of a contract presents a question of law subject to independent appellate review." *Cease Elec.*, 276 Wis. 2d 361, ¶ 14. That is, determining whether the transaction at issue was one for goods or services is a question of law. *See id.* As such, the application of the economic loss doctrine to a set of facts presents a question of law subject to *de novo* review. *See id.*, ¶ 15.

¶ 12. Furthermore, the construction or interpretation of an insurance policy presents a question of law to which we apply *de novo* review. *Hull v. State Farm Mut. Auto. Ins. Co.*, 222 Wis. 2d 627, 636, 586 N.W.2d 863 (1998). The same rules of construction that govern general contracts are applied to the language in insurance policies. "Judicial interpretation of a contract, including an insurance policy, seeks to determine and give effect to the intent of the contracting parties." *American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis. 2d 16, 673 N.W.2d 65. As such, insurance policies "are construed as they would be understood by a reasonable person in the position of the insured." *Id.*

¶ 13. In determining whether a party's claims are covered under an insurance contract, we first examine whether the insuring agreement makes an initial grant of coverage. *Id.*, ¶ 24. "If the claim triggers the initial

grant of coverage in the insuring agreement, we next examine the various exclusions to see whether any of them preclude coverage of the present claim." *Id.* If an exclusion does apply, we must then look to see whether there is an exception that reinstates coverage for that claim. *Id.* However, "[a]n exception pertains only to the exclusion clause within which it appears; the applicability of an exception will not create coverage if the insuring agreement precludes it or if a separate exclusion applies." *Id.*

### A. The economic loss doctrine does not apply here.

¶ 14. 1325 asserts that the trial court incorrectly applied the economic loss doctrine to dismiss 1325's negligence claims against T-3, and erroneously ruled that T-3 had no insurance coverage arising from such claims. 1325 insists that: (1) the economic loss doctrine does not operate to preclude coverage for 1325's contract claims, as Wisconsin law recognizes that claims alleged in contract against an insured can form the basis for coverage under a CGL policy; (2) the "integrated system" rule is factually inapplicable to bar CGL coverage; and (3) the economic loss doctrine does not bar professional liability insurance coverage for a construction manager's negligent failures of its independent common law duty to provide professional services. Because we conclude, in light of the recently decided *Cease Electric*, that the economic loss doctrine does not apply here because the contract at issue was one for services, and not for a product, we will address only those portions of 1325's arguments relevant to that conclusion.

¶ 15. "The economic loss doctrine is a judicially created doctrine providing that a commercial purchaser

402

of a product cannot recover from a manufacturer, under the tort theories of negligence or strict products liability, damages that are solely 'economic' in nature." *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 400, 573 N.W.2d 842 (1998). In *Sunnyslope Grading, Inc. v. Miller, Bradford and Risberg, Inc.*, 148 Wis. 2d 910, 437 N.W.2d 213 (1989), the supreme court evaluated the reasoning behind prohibiting recovery under tort for purely economic losses resulting from the purchase of a product, and concluded that the intent and effect of warranties and the Uniform Commercial Code do not contemplate recovery under tort principles. *Id.* at 916, 920–21. Discussing a United States Supreme Court case prohibiting recovery under tort theories for purely economic losses in a commercial litigation regarding a purchased product, the court explained: "The question of product value and quality is intended to be addressed by warranties and the Uniform Commercial Code. Contract law, the law of warranty and the Uniform Commercial Code are designed to allow the parties to allocate the risk of product failure." *Id.* at 920–21.

¶ 16. While defining economic loss is difficult, it is generally defined as "damages resulting from inadequate value because the product 'is inferior and does not work for the general purposes for which it was manufactured and sold.' " *Daanen & Janssen*, 216 Wis. 2d at 401 (citation omitted). Economic loss also includes both direct economic loss and consequential economic loss. *Id.* ("The former is loss in value of the product itself; the latter is all other economic losses attributable to the product defect."). The economic loss doctrine does not, however, bar recovery under tort for personal injury or damage to other property. *Id.* at 402.

¶ 17. "The significance of the economic loss doctrine is that 'it requires transacting parties in Wisconsin to pursue only their contractual remedies when asserting an economic loss claim, in order to preserve the distinction between contract and tort.' " *Cease Elec.*, 276 Wis. 2d 361, ¶ 24 (citation omitted). As tort law generally offers a "broader array of damages than contract[, t]he economic loss doctrine precludes parties under certain circumstances from eschewing the more limited contract remedies and seeking tort remedies." *Id.* This is a reasonable and unsurprising policy in light of the protections afforded by the U.C.C. *See id.*, ¶ 29. That is,

> [p]rotection against damages caused by a defective product injuring itself is the purpose of express and implied warranties provided for in the U.C.C. When a product fails to operate as warranted or expected, the proper avenue for relief is a breach of warranty claim. Alternatively, customers can reject the product or revoke their acceptance and sue for breach of contract.

*Id.*, ¶ 29 (citations omitted). Moreover, the U.C.C. provides protections for manufacturers as well—manufacturers can limit their risks and exposure by disclaiming warranties or limited remedies. *Id.*, ¶ 31. Thus, "if a commercial purchaser were allowed to sue in tort to recover solely economic loss, the U.C.C. provisions designed to govern such disputes could be circumvented entirely. In that event, the U.C.C. would be rendered meaningless and 'contract law would drown in a sea of tort.' " *Id.*, ¶ 32 (citation omitted).

¶ 18. This underlying rationale does not apply, however, when the dispute centers on a contract for services. *See id.*, ¶ 35. As the supreme court concluded in *Cease Electric*:

Unlike contracts for products or goods, which enjoy the benefit of well-developed law under the U.C.C., no such benefit exists for contracts for services. This is because the U.C.C. does not apply to service contracts. As a result, the built-in warranty provisions that the U.C.C. may provide in a contract for the sale of products or goods would not apply to a contract for services.

Given the inapplicability of the U.C.C. to service contracts, we decline to extend the economic loss doctrine in this case. We note that we are not alone in this regard. *See, e.g., Cargill, Inc. v. Boag Cold Storage Warehouse*, 71 F.3d 545, 550 (6th Cir. 1995) (citing the U.C.C. and stating that the economic loss doctrine "is associated with 'transactions in goods,' and not with transactions in services"); *McCarthy Well Co. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312, 315 (Minn. 1987) (explaining that the rationale behind the economic loss rule is that "a recognition of tort actions in cases under the U.C.C. would upset the remedies contained in the U.C.C.; when the rationale is not applicable, i.e., when the U.C.C. does not apply, there is no reason for the [economic loss] rule to apply).

276 Wis. 2d 361, ¶¶ 35–36 (some citations omitted). Thus, the supreme court concluded, in no uncertain terms, "that the economic loss doctrine is inapplicable to claims for the negligent provision of services." *Id.*, ¶ 52.

¶ 19. As such, we must now consider the nature of the agreement between 1325 and T-3 to determine whether the economic loss doctrine applies. Here, we are concerned with a contract for the provision of "construction administration and management services." Such services are not contemplated by the U.C.C. and its protections and remedies. Although T-3 argues that only about $176,000 of the approximately $6

405

million contract price was allocated as the fee for construction management services, and, therefore, this cannot be considered a contract for services, we are not persuaded that that is dispositive.[3] That is, it appears that while well over $5 million of the contract price may have been allocated for the cost of construction, that construction was being performed by subcontractors. To an extent, T-3 was merely the conduit through which the money flowed. T-3 was hired to manage the construction of the building; as part of that duty, it hired, and therefore also had to pay, subcontractors to perform work on the building. As such, it would be reasonable to conclude that the money was being utilized by T-3 to pay subcontractors in the course of its management of the construction, and was not paid to T-3 for any product it was personally constructing. Indeed, we have not been pointed to anything in the record indicating that T-3 performed any of the construction, and it conceded at oral argument that it had no design authority. As such, it does not seem reasonable to conclude that because only approximately $176,000 of the $6 million contract was specifically allocated to pay T-3 for its construction management services, that this was actually a contract for a product and not a contract for services.[4]

---

[3] The agreement provides:

In consideration for the performance of this Contract, Owner shall pay the Construction Manager, as compensation for all services of the Construction Manager under the Contract, a C.M. fee in the amount of a lump sum fee equal to One Hundred Seventy-Six Thousand and No/100 Dollars ($176,000.00). The C.M. Fee is a stipulated sum and shall not increase or decrease as the result of any changes in the Work or construction change directives.

[4] We note that, at oral argument, when discussing the applicability of the economic loss doctrine to the case at hand,

¶ 20. Moreover, any distinction between the circumstances in *Cease Electric* and those here do not

T-3 asserted that *Cease Electric* merely held that the economic loss doctrine does not apply to service contracts, and that nothing in the opinion suggests that the economic loss doctrine is limited to transactions covered by the U.C.C. (We observe, however, that that assertion is not entirely accurate. Indeed, after evaluating the policy considerations underlying the economic loss doctrine, the supreme court concluded: "On balance, we conclude that the policy considerations underlying the economic loss doctrine do not support its extension here. Instead, they buttress our decision not to extend the doctrine given the inapplicability of the U.C.C." *Insurance Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI 139, ¶ 48, 276 Wis. 2d 361, 688 N.W.2d 462.) To bolster this argument, T-3 pointed to *Van Lare v. Vogt, Inc.*, 2004 WI 110, 274 Wis. 2d 631, 683 N.W.2d 46, a case decided months before *Cease Electric*, in which the supreme court held that the economic loss doctrine applied to the sale of real estate, which is not governed by the U.C.C. T-3 maintained that the supreme court, in *Cease Electric*, most likely did not mean to overrule *Van Lare sub silencio*. After reviewing *Van Lare*, we are not persuaded that the decision in that case affects our conclusion in this case. In *Van Lare*, the supreme court concluded:

> While we do not decide today whether the broader conceptualization of the economic loss doctrine in *Tietsworth* covers all real estate transactions, we conclude that the economic loss doctrine may not be discarded simply because a transaction involves real estate. In this case, we have a written, bargained-for contract for the sale of commercial-use land between two sophisticated parties represented by counsel during the negotiation process. This is the kind of situation that is tailor made for the application of traditional contract law.

*Van Lare*, 274 Wis. 2d 631, ¶ 21. In doing so, the court also cited several cases reasoning, for example, that there was no reason to bar the application of the economic loss doctrine because real estate was the "product" in question. *Id.*, ¶ 20. Here, however, the situation is quite different. We are not concerned with the purchase of a "product," whether it be real estate or a piece of

work to render this contract any less of a service contract. The circumstances in *Cease Electric* were straight forward—Cease Electric was provided with the component parts, given a one-page wiring schematic, and asked to install a ventilation system.[5] The supreme court concluded that Cease Electric was hired to perform a service, and rejected Cease Electric's argument that it provided a product. Here, the facts are quite different. The agreement between 1325 and T-3 is considerably more sophisticated and extensive, but boiled down to its essence, it is still a contract for services. T-3 was supplied with the plans for the renovation, concededly had no design authority to alter those plans, and was hired to manage the construction and renovation of the warehouse. Such an agreement is not a contract for a product.[6]

¶ 21. Furthermore, "mindful of the ramifications that would accompany a decision to extend the doctrine" to contracts for services, the supreme court noted that "Wisconsin courts have previously held that claims for professional malpractice lie both in tort and

machinery. We are concerned with a contract for the provision of construction management services.

[5] There was also some suggestion that Cease Electric provided some additional component parts, but the supreme court found no evidence in the record to support that contention. *See Cease Elec.*, 276 Wis. 2d 361, ¶¶ 16 & n.5, 21.

[6] Although T-3 also argues that *Linden v. Cascade Stone Co.*, 2004 WI App 184, 276 Wis. 2d 267, 687 N.W.2d 823, *review granted,* 2005 WI 1, 277 Wis. 2d 151, 691 N.W.2d 353, governs here, as it contends that this is a "mixed" contract, which necessitates the application of the "predominant purpose" test to determine whether the contract at issue is one for a product or a service, we conclude that this is not a mixed contract that involves both products and services, and as such, we need not apply the predominant purpose test.

contract[, and b]ecause actions against professionals often involve purely economic loss without personal injury or property damage, the economic loss doctrine could be used to effectively extinguish such causes of action in tort." *Id.*, ¶ 49 (citations omitted). Thus, it was unwilling to put itself in the position of having to decide whether an exception should be made for some or all professional groups, *id.*, ¶ 50, and instead decided to create a bright-line rule for service contracts, *id.*, ¶ 52. Accordingly, any argument to the contrary—that the economic loss doctrine should apply to contracts for professional services—has been rejected.[7]

¶ 22. As such, the economic loss doctrine does not apply here, and consequently, the negligence claims were improperly dismissed by the trial court. In light of this conclusion, we must now consider the effects of the relevant coverage provisions and exclusions on all of the claims raised by 1325.[8]

---

[7] T-3 also argues that construction management cannot be deemed professional services, because construction managers are not "true professionals" in that they "are neither licensed nor regulated by the state." As T-3 has failed to cite to any law in support of that proposition, we refuse to consider it. *See, e.g., State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992). At any rate, the Westport policy—a professional liability policy—provides: " 'PROFESSIONAL SERVICES' MEANS those services that an insured is legally qualified to perform for others in the insured's practice as an architect, engineer, land surveyor, landscape architect, construction manager, or as specifically defined by endorsements to this policy."

[8] That is, all but those claims that 1325 stipulated to the dismissal thereof.

*B. 1325's claims against T-3 trigger Indiana's CGL coverage, but may be precluded by exclusions in the insurance policy.*

¶ 23. 1325 argues that, contrary to the trial court's conclusion, Wisconsin law recognizes that claims alleged in contract against an insured can form the basis for coverage under a CGL policy. Moreover, 1325 insists that Indiana's policy provides coverage for accidental property damage caused by an "occurrence" alleged as a breach of contract claim, that 1325 "is neither seeking recovery for every subcontractor failure[,] nor for damages caused by warranted products incorporated into its building, but only for a specific group of accidentally-caused property damage[,]" and that the policy exclusions do not bar coverage under the facts of this case.

¶ 24. Indiana argues that "the trial court never rejected and, in fact, did not address 1325's contract claims as a basis for recovery under Indiana's policy[,]" because 1325 conceded, on numerous occasions, that the CGL policy did not provide coverage for the contract claims. As such, Indiana claims that these issues are being raised for the first time on appeal, and thus should be disregarded. In any event, Indiana insists that there is no recovery for contract claims under the policy because: (1) *American Girl* has no direct impact upon the applicability of CGL business risk exclusions —which they assert defeat coverage for the entirety of 1325's complaint—and is not binding precedent, since only three justices joined in the opinion; (2) there is no claim for property damage; and (3) there is no "occurrence" under the contract claim. Moreover, Indiana argues that, should we reverse the trial court and determine that "coverage may be afforded under any

410

portion of Indiana's policy, the case should be remanded to the trial court to determine the applicability of the business risk exclusions." In the alternative, Indiana argues that it is clear that the exclusions apply and there is no coverage under the policy for 1325's losses.

¶ 25. We have concluded that the economic loss doctrine is inapplicable here, and thus the negligence claims are still viable. We also conclude that 1325's allegations appear to trigger coverage. However, relevant exclusions in Indiana's CGL policy may preclude coverage, though the extent to which those exclusions apply is a determination better left to the trial court, as the exclusions were not fully considered below, were not adequately briefed on appeal, and do invoke factual issues to be determined on remand. Moreover, while the arguments focused on the negligence claims, we are not convinced that 1325 necessarily conceded the contract claims. In any event, *American Girl* nonetheless reinforces that it is the language of the policy, and not the applicability of the economic loss doctrine, that determines whether an insurance policy covers a claim.[9] We must look to the claim itself and the language of the policy to determine whether there is coverage.[10]

---

[9] Moreover, we will also follow *American Family Mutual Insurance Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis. 2d 16, 673 N.W.2d 65, as precedent, despite Indiana's argument to the contrary.

[10] Indeed, in regard to the insurance company's assertion that "because [the] claim is for breach of contract/breach of warranty it cannot be an 'occurrence,' because the CGL is not intended to cover contract claims arising out of the insured's defective work or product[,]" *American Girl* explained:

> We agree that CGL policies generally do not cover contract claims arising out of the insured's defective work or product, but this is by operation of the CGL's business risk exclusions, not because a loss

¶ 26. Here, 1325 claims that as a result of the negligence of T-3 and its subcontractors, it suffered property damage covered by the Indiana policy.[11] The CGL policy has several relevant provisions:

### 1. Insuring Agreement

actionable only in contract can never be the result of an 'occurrence' within the meaning of the CGL's initial grant of coverage.

268 Wis. 2d 16, ¶ 39. " 'Occurrence' is not defined by reference to the legal category of the claim. The term 'tort' does not appear in the CGL policy." *Id.*, ¶ 41 (footnote omitted).

[11] At oral argument, Indiana argued that since the damages that 1325 claims Indiana "is liable" for were caused by subcontractor accidents, and the basis for that liability is the indemnity agreement in the contract that says that T-3 will indemnify 1325 for damage caused by subcontractors, they are not "property damages," but instead a contractual obligation. Indiana then asserted, for the first time, that an express provision in the CGL policy excludes coverage for the insured's assumed liabilities, which Indiana contends includes those liabilities assumed in the indemnity agreement. Indiana did not raise this issue in either its brief in support of summary judgment or its brief on appeal. We note, however, that this argument appears to be flawed. The Indiana policy includes an exclusion providing that the insurance does not apply to: " 'Bodily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." The policy also provides, however, that "[t]his exclusion does not apply to liability for damages . . . [t]hat the insured would have in the absence of the contract or agreement; *or* . . . [a]ssumed in a contract or agreement that is an 'insured contract', provided the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement." (Emphasis added.) "Insured contract" is defined, in part, as "[t]hat part of any other contract . . . under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization." The indemnity agreement is arguably such a contract.

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .

**b.** This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "bodily injury" or "property damage" occurs during the policy period.

. . . .

**2. Exclusions**

This insurance does not apply to:

. . . .

**j. Damage To Property**

"Property damage" to:

. . . .

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

. . . .

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; . . .

. . . .

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

The policy also includes the following definitions:

- "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

 a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

414

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

 . a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement.

- "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

- "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

415

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

. . . .

- "Property damage" means:

 a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time the physical injury that caused it; or

 b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

- "Your product" means:

 a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

 (1) You;

 (2) Others trading under your name;

 (3) A person or organization whose business or assets you have acquired; and

 b. Containers (other than vessels), materials, parts or equipment furnished in connection with such goods or products.

 "Your product" includes:

 a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

416

 b. The providing of or failure to provide warnings or instructions.

 . . . .

- "Your work" means:

 a. Work or operations performed by you or on your behalf; and

 b. Materials, parts or equipment furnished in connection with such work or operations.

- "Your work" includes:

 a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or used of "your work"; and

 b. The providing of or failure to provide warnings or instructions.

¶ 27. First, we must examine the grant of coverage. As noted above, the Indiana policy provides that it will cover damages that T-3 becomes legally obligated to pay resulting from "property damage" caused by an "occurrence" that takes place in the coverage area during the policy period. The policy defines "property damage" as, among other things, "[p]hysical injury to tangible property, including all resulting loss of use of that property." Here, 1325 alleges a considerable amount of physical injury to tangible property—"a concrete slab smashed into an existing ceiling that was not being modified as part of the renovation and then punched through a newly completed shear wall on the next floor of the building, rendering it useless"; "subcontractor demolishing an existing staircase on the west side of the building failed to adequately brace the second floor opening created by the removal, causing

417

the reinforced concrete at the north side of the opening to sag and require structural bracing"; damage to already-installed work of other subcontractors; fabricated steel pieces run over by construction equipment; "demolition subcontractor . . . used a piece of equipment with a hammer attachment that did not stop at breaking out of the top layer of concrete, and instead broke completely through the reinforced concrete leaving holes completely through the slab in flooring that was otherwise not to be altered by the construction of the project"—that appears to initially satisfy the property damage requirement.

¶ 28. The property damage, however, must be caused by an "occurrence." As indicated above, "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Accident" is not otherwise defined in the policy, but the incidents described above must surely be considered accidents. Words in a policy should be given their common, everyday meaning. *Paape v. Northern Assurance Co. of Am.*, 142 Wis. 2d 45, 51, 416 N.W.2d 665 (Ct. App. 1987). But, "[r]esort to a recognized dictionary may be had in order to discern the plain meaning." *Holsum Foods Div. of Harvest States Coops. v. Home Ins. Co.*, 162 Wis. 2d 563, 569, 469 N.W.2d 918 (Ct. App. 1991). Indeed, *American Girl* cites the definition of "accident" from Black's Law Dictionary: " 'The word "accident," in accident policies, means an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental." 268 Wis. 2d 16, ¶ 37 (citation omitted). Thus, we conclude that the initial grant of coverage has been triggered by 1325's claims—1325 is seeking coverage for

accidentally caused property damage that it contends T-3 is legally obligated to pay.

¶ 29. Next, we must consider whether any exclusions in the policy preclude coverage for 1325's claims. Indiana contends that the business risk exclusions in the policy defeat coverage for the entirety of the complaint, and that its CGL policy does not provide coverage for property damage to an insured's product or work, or for faulty workmanship, which they contend is what is claimed here. 1325, on the other hand, insists that it is not seeking coverage for faulty workmanship or property damage to an insured's product or work, but instead for accidentally caused property damage to areas of the building on which work had already been completed or that were never intended to be renovated. The trial court never reached the exclusions.

¶ 30. Indiana contends that Exclusion K—"[t]his insurance does not apply to . . . " '[p]roperty damage' to 'your product' arising out of it or any part of it"—has clear application in this case because the pretrial discovery shows that the renovated building is the "product" of T-3. We are not persuaded. "Product" is defined in the policy as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by . . . you" or "[c]ontainers (other than vessels), materials, parts or equipment furnished in connection with such goods or products." It would be a stretch to consider the renovation project a "product" of T-3. Though Indiana cites foreign case law indicating that other jurisdictions have held that the "entire house is the product of the builder," *see Commerce Insurance Co. v. Betty Caplette Builders, Inc.*, 647 N.E.2d 1211, 1213 (Mass. 1995), we are not persuaded by this reasoning, especially in light of the fact that many of those

419

cases involved builders who construct and sell residences from scratch. Here, T-3 was managing the renovation of an existing building that it did not design or own. As we must consider the plain meaning of the language, we cannot conclude that the damage claimed was to a "product" of T-3.

¶ 31. Exclusion L provides that the policy does not cover " '[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.' " However, it also provides that "[t]his exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." Even assuming that the conditions of the exclusion are satisfied, the exception restores coverage here, as it appears that "the work out of which the damage arises was performed on [T-3's] behalf by a subcontractor."

¶ 32. Exclusion M provides that the policy does not cover " '[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work'[,]" among other things, but also that "[t]his exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use." Indiana does not provide, however, any explanation as to how or why this exclusion applies—it merely duplicates the exclusion and the definition of "impaired property" in its brief and concludes that "[a]s a result of this exclusion, there is no coverage for non-physical property damage or damages that can be repaired" because "1325 is claiming that, in essence, the building was 'impaired property' because it incorporated T-3's

defective work product." Without more, we cannot properly consider the applicability of the exclusion.

¶ 33. Finally, we reach Exclusions J (5) and J (6), which provide that the policy does not cover property damage to:

> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

"Your work" is defined as "[w]ork or operations performed by you or on your behalf." Indiana contends that both exclusions clearly preclude coverage for 1325's claims.

¶ 34. Read plainly, J (5) excludes coverage for property damage to the particular part of the real property on which T-3 or its subcontractors "are performing operations" if the damage arises out of those operations.[12] Thus, if it were to be determined that the damages occurred to the part of real property on which the subcontractors were performing operations, and the damages arose out of those operations, then coverage would be excluded. It seems clear that the damages claimed by 1325 arose from the subcontractors' opera-

---

[12] 1325 contends that other jurisdictions have held this exclusion to be ambiguous, and cited one in particular—*Fisher v. American Family Mutual Insurance Co.*, 579 N.W.2d 599 (N.D. 1998)—to illustrate this alleged ambiguity. The ambiguity considered by *Fisher* appears to be concerned with whether there is a temporal element in the exclusion. That does not, however, appear to be a concern here.

tions, in that they were caused by accidents that occurred in the course of their work on the site. Whether the property damage was to "that particular part of real property on which" the subcontractors were "performing operations," however, invokes a number of factual determinations that have not been thoroughly argued here or considered below, and that we are not at liberty to make. That is, 1325 contends that the damage occurred to work that had already been completed or parts of the building that were never intended to be renovated. Indiana disagrees with that conclusion. As such, these exclusions raise questions of fact that have not been considered below, and thus, should be addressed by the trial court.[13]

¶ 35. Moreover, the same can be said for J (6). J (6) excludes coverage for property damage to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' [which includes that work done on behalf of T-3] was incorrectly performed on it." Excepted from the J (6) exclusion, however, is "property damage" included in the "products-completed operations hazard." Because this exclusion requires a determination of whether the work was "incorrectly performed on" the damaged property, and perhaps whether the "products-completed hazard" applies, the factual backgrounds and circumstances of each claimed "accident" need to be considered on a case-by-case basis, to determine whether the exclusion applies. Since the parties do not appear to agree on the factual backgrounds and circumstances of these accidents, and have not fully developed their arguments with regard thereto, these are questions of fact better left to the trial court on remand.

---

[13] As indicated above, the trial court never reached the exclusions, because it dismissed all of the negligence claims on the basis of the economic loss doctrine.

¶ 36. Thus, while we agree that business risk exclusions may be applicable here, the factual circumstances of 1325's claims need to be explored in more detail than has been provided in the briefs, and as such, the determination of the extent to which these exclusions preclude coverage invokes factual issues to be determined on remand.

C. *The professional liability policy requires Westport to defend and indemnify T-3 against 1325's claims concerning T-3's failure to provide adequate professional services.*

¶ 37. 1325 contends that Westport's professional liability policy provides coverage for 1325's breach of contract claims that T-3 inadequately provided professional services. It insists that a professional liability policy that covers an insured's "negligent acts, errors and omissions" provides coverage for contract claims, and specifically, that: (1) malpractice claims may be asserted in both tort and contract; (2) Westport's interpretation is inconsistent with the broad grant of coverage afforded under its insuring clause, would render coverage provisions superfluous, is contrary to that of a reasonable person in the position of the insured, and is not in harmony with all of its policy provisions; (3) there is no limitation in Westport's policy barring actions for parties in contractual privity with its insured; and (4) there are no exclusions in the Westport policy that bar coverage here.

¶ 38. Westport asserts that professional liability policies are designed to insure against third-party claims arising out of damage caused by the negligent performance of the professional task, and that its policy

insures only for liability imposed as a result of wrongful acts, which require negligent conduct. Westport contends that its policy should not be treated as a performance bond and does not provide coverage for contractual liability, asserting that "the policy requires a legal obligation to pay for loss or damage, because of a wrongful act committed by the insured[;]" that breach of contract is not a wrongful act, because "wrongful act" is defined as "actual or alleged negligent act, error or omission[,]" which it insists requires negligent conduct; that in the absence of tort or negligence-based claims, there is no wrongful act as required by the policy, and thus, Westport has no obligation to indemnify.

¶ 39. Westport also cites a number of foreign cases in support of the proposition that a policy premised on "negligent act[s], error[s] or omissions" does not provide coverage for breach of contract, even if the conduct precipitating the breach was negligent. Moreover, Westport claims that, unlike in a scenario involving attorney malpractice, for example, "[h]ere, there is no duty, breach of duty, accident or fortuity independent of the contractual relationship." Thus, Westport asserts that absent a common law duty independent of the contract between the parties, there is no right to bring a tort action. And, finally, Westport contends that even if coverage is triggered, exclusions in the policy eliminate coverage for 1325's claims.

¶ 40. We have already concluded that the economic loss doctrine does not apply here, and as such, the negligence claims were improperly dismissed. Nonetheless, the broad grant of coverage in the professional liability policy cannot be interpreted to limit coverage in the way Westport advocates. The Westport policy provides:

> We shall pay on behalf of any insured all "loss" . . . which any insured becomes legally obligated to pay as a result of "claims" first made against any insured during the "policy period" . . . by reason of any "wrongful act" . . . .

"Wrongful act" is defined as "any actual or alleged negligent act, error or omission in the performance of 'professional services' for others by an insured . . . ." "Professional services" are defined as "those services that an insured is legally qualified to perform for others in the insured's practice as [a] . . . construction manager . . . ."[14]

¶ 41. Where Westport appears to err is in its failure to appreciate that this is essentially a claim of failure to adhere to professional standards, sounding in negligence, but arising in the context of a contract.[15] Malpractice actions "may sound in either tort or contract." *McMahon v. Brown*, 125 Wis. 2d 351, 353, 371 N.W.2d 414 (Ct. App. 1985). Indeed, we have previously explained that failure to exercise ordinary care in the fulfillment of a contract is a tort if there is a common-law duty to exercise ordinary care independent of the contract and the contract is merely the inducement creating the state of things that furnishes the occasion

---

[14] "Claim" is defined as "a demand made upon you for loss, including, but not limited to, service of suit or institution of arbitration proceedings or administrative proceedings against you." "Loss" is defined as "the monetary or compensatory portion of any judgment, award or settlement[,]" subject to several non-relevant exclusions. Both are very broad.

[15] Westport also cites to a number of cases concerning commercial general liability policies. Since we are dealing with a professional liability policy here, we will not directly address those arguments.

of the tort. *Milwaukee Partners v. Collins Engrs, Inc.*, 169 Wis. 2d 355, 361–62, 485 N.W.2d 274 (Ct. App. 1992). Moreover, "[s]ince members of a profession have a common-law duty to exercise the standard of care ordinarily exercised by the members of that profession," *Collins Engineers* concluded that the contract in that case "did not *create* the duty of care but, rather, merely "furnishe[d] the occasion" for fulfillment of that duty[.]" *Id.* at 362 (citation omitted). The same reasoning applies here. The contract did not create T-3s duty to exercise the requisite standard of careit merely furnished the occasion for the fulfillment of that duty. The claims here are not based solely on contractual liability.

¶ 42. In Westport's policy, "wrongful act" is not defined as a "third-party cause of action in tort." It is defined as any "negligent act, error or omission in the performance of 'professional services' for others[.]" Here, 1325 has alleged a number of "negligent acts, errors or omissions in the performance of [T-3's] 'professional services' " in its complaint. These allegations not only assert a breach of contract *and* a failure to exercise the requisite standard of care, but also trigger the professional liability policy's coverage for T-3's "wrongful acts." If T-3 did not expect to be held liable for any damages that may result from failing to provide adequate professional services, should such allegations be raised and proven, what, then, would be the purpose of *professional liability* insurance?

¶ 43. Finally, we conclude that neither of the exclusions raised by Westport apply here. Exclusion E provides that the policy shall not apply to any claim based upon "[t]he cost to repair or replace faulty workmanship in any construction, erection, fabrication, installation, assembly, manufacture or remediation per-

formed by the insured . . . ." As there is no indication that T-3 performed any construction, and the exclusion does not refer to construction management services in any form, this exclusion does not apply. Exclusion K excludes coverage for claims based upon, arising out of, attributable to, or directly or indirectly resulting from express warranties or guarantees. It does not appear that 1325 has alleged any claim against T-3 on the basis of any warranty or guarantee, and although Westport insists that 1325 is "attempting to enforce a contract, a warranty and a guarantee[,]" it has failed to present that argument with any real specificity. In light of our discussion above, we are unconvinced that this exclusion applies. For these reasons, we reverse and remand for further proceedings.

*By the Court.*—Judgment and orders reversed and cause remanded with directions.