1325 NORTH VAN BUREN, LLC,
Plaintiff-Appellant,

v.

T-3 GROUP, LTD.,
Defendant-Respondent-Petitioner,

WESTPORT INSURANCE CORPORATION,
Defendant-Respondent-Cross Petitioner,

INDIANA INSURANCE COMPANY,
Defendant-Respondent,

RACINE BUILDING SUPPLY, LLC,
and Federal Insurance Company,
Defendants.

Supreme Court

*No. 2004AP352. Oral argument February 22, 2006.
—Decided July 11, 2006.*

2006 WI 94

(Also reported in 716 N.W.2d 822.)

For the defendant-respondent-petitioner there were briefs by *David J. Hanus* and *Hinshaw & Culbertson, LLP,* Milwaukee; *Lawrence J. Drabot* and *Crivello, Carlson & Mentkowski, S.C.,* Milwaukee, and oral argument by *David J. Hanus.*

For the defendant-respondent-cross petitioner there were briefs by *Vincent P. Tomkiewicz, George J. Manos,* and *Bollinger, Ruberry & Garvey,* Chicago, IL, and oral argument by *Vincent P. Tomkiewicz.*

For the plaintiff-appellant there was a brief by *Kimberly A. Hurtado, Nicole M. DeMatteis,* and *Hurtado, S.C.,* Wauwatosa; *Patrick O'Connor* and *Faegre & Benson,* Minneapolis, MN, and oral argument by *Patrick O'Connor.*

An amicus curiae brief was filed by *W. Wayne Siesennop, Scott J. Thomsen, Corrado Cirillo* and *Siesennop & Sullivan,* Milwaukee, on behalf of the American Council of Engineering Companies of Wisconsin and the Wisconsin Society of Architects, Inc.

¶ 1. JON P. WILCOX, J. T-3 Group, Ltd. (T-3) seeks review of a court of appeals decision reversing the entry of summary judgment dismissing all negligence claims brought by 1325 North Van Buren, LLC (1325) entered by the Milwaukee County Circuit Court, Mel Flanagan, Judge. *See 1325 N. Van Buren, LLC v. T-3 Group, Ltd.,* 2005 WI App 121, 284 Wis. 2d 387, 701 N.W.2d 13. Westport Insurance Corporation (Westport) seeks review of the court of appeals' reversal of a declaratory judgment in Westport's favor dismissing all of 1325's claims against it and declaring that Westport has no obligation to defend or indemnify T-3 against 1325's claims. *Id.*

¶ 2. 1325 contracted with T-3 for the purpose of substantially renovating an existing industrial warehouse into a 42–unit condominium building with attached parking garages. After numerous accidents and setbacks, 1325 fired T-3 and filed a lawsuit alleging claims in both tort and contract against T-3. 1325 also sued T-3's commercial general liability (CGL) insurer, Indiana Insurance Company (Indiana), and T-3's professional liability insurer, Westport. The circuit court dismissed 1325's tort claims against T-3, concluding that the economic loss doctrine barred such claims. Left with only contract claims, the circuit court also concluded that neither Indiana's CGL policy nor Westport's professional liability policy provided coverage for 1325's contract claims against T-3.

¶ 3. The court of appeals reversed in all respects, concluding: (1) the economic loss doctrine did not apply because the contract between T-3 and 1325 was purely for services; (2) unresolved factual questions precluded a determination of whether Indiana's CGL policy provided coverage; and (3) Westport's professional liability policy provided coverage.

¶ 4. T-3 petitioned for review and contends the economic loss doctrine precludes 1325's negligence claims. Westport joined T-3's petition for review as a direct-action defendant and filed a separate cross-petition contending that the economic loss doctrine precludes 1325's negligence claims and that its policy does not provide T-3 with coverage against breach of contract claims.[1]

---

[1] Although the court of appeals reversed the circuit court's grant of summary judgment to Indiana, it did not petition this court for review; therefore, our discussion refers to Indiana's involvement only as necessary.

¶ 5.　We conclude that the economic loss doctrine applies to the mixed contract between T-3 and 1325 as the predominant purpose of the contract was to construct a 42–unit condominium complex with adjacent parking garages. Furthermore, Westport has a duty to defend and potentially indemnify T-3 for its breach of contract claim under our interpretation of its professional liability insurance contract. As such, the decision of the court of appeals is reversed with respect to T-3's appeal, affirmed with respect to Westport's cross-appeal, and remanded to the circuit court for further proceedings consistent with this opinion.

I

A.　The Contract Between 1325 and T-3

¶ 6.　On March 26, 2001,[2] 1325 and T-3 entered into a comprehensive 102–page contract consisting of the following:　(1) a customized American Institute of Architects (AIA) "Standard Form of Agreement Between Owner and Construction Manager where the Construction Manager is also the Constructor;" (2) Amendment No. 1; (3) Contract Addendum; (4) Exhibits; (5) General Conditions of the Contract for Construction—AIA Document A201; (6) Supplement to the General Conditions of the Contract for Construction; and (7) various drawings and finish specifications.

¶ 7.　T-3 was hired to renovate an industrial warehouse building owned by 1325 into a 42–unit condominium complex, and construct attached parking garages. In addition to providing the necessary materials

---

[2] The parties apparently agreed upon the base contract on March 26, but did not agree upon the amendments to the base contract until approximately April 12, 2001.

418

for renovation and construction, T-3 was to provide construction management services, meaning it had to hire, coordinate, and supervise the numerous subcontractors, and generally manage the project to ensure the renovation was completed on time and within budget. The contract called for 1325 to pay the cost of the work plus T-3's construction management fee up to a guaranteed maximum price of $6,099,891. Of this price, $176,000 constituted the fee for construction management. Absent change orders, costs in excess of the guaranteed maximum price would be borne exclusively by T-3.

¶ 8. There are a number of contractual provisions worth noting. First, there is a broad warranty clause that reads in part as follows:

> The Contractor warrants to the Owner, the condominium association to be formed, the unit owners and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work[3] will be free from defects not inherent in the quality required or permitted, and that the Work will conform with the requirements of the Contract Documents.

The contract also contains the following noteworthy provisions:

(1) T-3 agreed to "promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to

---

[3] The term "Work" means "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project."

property [on the project site] caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor . . . ."

(2) T-3 agreed to indemnify 1325 against any claims for bodily injury or tangible property damage, other than to property that was part of the project, where the loss resulted from the negligent acts or omissions of T-3 or a subcontractor. In addition, the contract required that T-3 purchase contractual liability insurance to cover indemnification claims under § 3.18.1 of the General Conditions.

(3) Explicitly excluded from project costs were "[c]osts due to the negligence or willful acts or omissions of the Construction Manager, any subcontractor, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including but not limited to the correction of defective or non-conforming Work, . . . or making good any damage to property."

(4) The contract listed reasons for which 1325 could withhold payment.

(5) The contract included a liquidated damages provision requiring T-3 to pay $1,000 per day for each condominium unit not delivered on time.

(6) The contract required T-3 to have a CGL policy with limits of $2,000,000.

(7) The contract required T-3 to have an umbrella policy with limits of $4,000,000.

(8) The contract provided circumstances under which it could be terminated before the project was completed.

¶ 9. Construction began in March of 2001. The contract required the first condominium units to be completed by October 15, 2001, and the last condominium units to be completed by January 15, 2002. Near

the end of October 2001, however, the project was approximately 28 percent complete and none of the condominiums were substantially completed. Subcontractors caused accidental damage throughout the existing structure, and the project was seriously delayed. Dissatisfied with T-3's progress, 1325 notified T-3 that it was in default under the contract by letter dated October 31, 2001, and T-3 left the project site that same day. 1325 then entered into a contract with C.G. Schmidt, Inc. on January 8, 2002, to complete the project.

¶ 10. Because of T-3's failure to meet the contract milestones and specifications, 1325 alleges it incurred millions of dollars in damages. According to 1325's Amended Itemization of Damages, 1325 sought the following damages:[4] (1) overpayment to T-3 based on the percentage completion of work; (2) construction damages and defects; (3) completion costs in excess of original guaranteed maximum price contract amount; (4) additional project costs; (5) unrecoverable costs of work claimed by T-3; (6) injury to 1325's business reputation and lost opportunity damages; and (7) liquidated damages. Although the amount of actual damages is in dispute, the circuit court held the contractual liquidated damages provision, under which T-3's liability is $11,060,000, enforceable and that 1325 had elected to pursue liquidated rather than actual damages as its remedy for breach of contract.

B. T-3's Professional Liability Policy with Westport

¶ 11. Westport provided professional liability insurance coverage to T-3 under a policy effective from October 15, 1999, to October 15, 2002. The policy

---

[4] It is undisputed that 1325 does not claim damages for personal injury or property damage to property beyond the subject matter of the contract.

provided limits of liability of $5,000,000 per claim and in the aggregate. The insuring agreement states that Westport "shall pay on behalf of any insured all 'loss' in excess of the deductible which any insured becomes legally obligated to pay as a result of 'claims' first made against any insured during the 'policy period' . . . by reason of any 'wrongful act[.]' " Relevant definitions in the policy include the following:

(1) Claim—"a demand made upon you for loss[.]"

(2) Loss—"the monetary and compensatory portion of any judgment, award, or settlement[.]"

(3) Wrongful Act—"any actual or alleged negligent act, error or omission in the performance of 'professional services' for others by an insured[.]"

(4) Professional Services—"those services that an insured is legally qualified to perform for others in the insured's practice as . . . construction manager, or as specifically defined by endorsement to this policy."

¶ 12. Westport raised an argument in the court of appeals concerning the applicability of two exclusions in the policy. The court of appeals held that the exclusions did not apply. Westport has not argued before this court that 1325's claims are barred by the policy exclusions. Accordingly, we do not address whether any of the policy exclusions apply.

C. Procedural History

¶ 13. On April 18, 2002, 1325 filed its second amended complaint against T-3, asserting claims of, inter alia, breach of contract, negligence, and negligent

misrepresentation.[5] In addition, 1325 brought direct actions against Westport and Indiana. Shortly after 1325 filed suit, T-3 ceased doing business and its lender seized its remaining assets; as a result, the only opportunity 1325 has to recover is if it can bring its claim under T-3's CGL or professional liability policies.

¶ 14. Indiana moved for declaratory and summary judgment on the pleadings, asking for a declaration that Indiana had no duty to defend and indemnify T-3 against 1325's claims because they were not covered or were excluded by the policy. The circuit court concluded that two causes of action, a negligence claim and a coverage claim, were sufficiently pled so as to trigger Indiana's duty to defend and that neither the economic loss doctrine nor any exclusions barred coverage under the policy.

¶ 15. Indiana later filed for another summary judgment, alleging that pretrial discovery had revealed that the pertinent exclusions in the policy barred coverage for all damages and also that the economic loss doctrine permitted recovery only under a contract theory. For its part, T-3 also filed a motion for partial summary judgment seeking dismissal of 1325's tort claims under the economic loss doctrine. Westport joined in this motion.

¶ 16. In a ruling from the bench on July 8, 2003, the circuit court granted T-3's motion. The court was persuaded by the reasoning of *Bay Breeze Condominium Association, Inc. v. Norco Windows, Inc.*, 2002 WI App 205, 257 Wis. 2d 511, 651 N.W.2d 738, in that

---

[5] By stipulation and order of February 28, 2003, the circuit court dismissed 1325's claims for intentional misrepresentation, theft by contractor, slander of title, and failure to defend and indemnify against construction liens, with prejudice, in exchange for T-3 dismissing its $3.7 million construction lien, quantum meruit, unjust enrichment and breach of contract counterclaims.

any property damage was not to "other property" under the integrated systems rule. Furthermore, the circuit court was persuaded that regardless of whether the contract was for products or services, it was between two sophisticated parties. *See Wausau Paper Mills Co. v. Chas. T. Main, Inc.*, 789 F. Supp. 968 (W.D. Wis. 1992). As such, the economic loss doctrine applied and only breach-of-contract claims remained against T-3. A subsequent order was entered on November 18, 2003. The circuit court also granted Indiana's motion for summary judgment and Indiana was dismissed from the action.

¶ 17. With the negligence claims dismissed, Westport filed a motion for declaratory relief and bifurcation, arguing that it had no duty to defend T-3 and that its professional liability policy did not provide coverage for 1325's contract claims against T-3. On December 3, 2003, the circuit court granted Westport's motion and ruled that Westport had no obligation to continue to defend or indemnify T-3 against the breach of contract action because 1325's claims were for purely economic loss.[6] A subsequent order dismissing Westport from the lawsuit was entered on December 17, 2003.

¶ 18. 1325 appealed only the final judgments dismissing Indiana and Westport from the action, and thus the underlying orders granting summary and declaratory judgment to those two parties. The order granting T-3's motion for partial summary judgment was not final, and 1325 did not appeal from that order. However, T-3 sought and received permission to intervene for the limited purpose of briefing the application of the economic loss doctrine. The court of appeals subsequently reversed the circuit court in all respects.

---

[6] However, Westport has continued to defend T-3 in light of the subsequent appeals.

¶ 19. First, relying upon *Insurance Co. of North America v. Cease Electric, Inc.*, 2004 WI 139, 276 Wis. 2d 361, 688 N.W.2d 462, the court of appeals held the economic loss doctrine did not apply because the contract was for services. *1325 N. Van Buren*, 284 Wis. 2d 387, ¶ 14. In the words of the court of appeals:

> Here, we are concerned with a contract for the provision of "construction administration and management services." Such services are not contemplated by the U.C.C. and its protections and remedies. Although T-3 argues that only about $176,000 of the approximately $6 million contract price was allocated as the fee for construction management services, and, therefore, this cannot be considered a contract for services, we are not persuaded that that is dispositive. That is, it appears that while well over $5 million of the contract price may have been allocated for the cost of construction, that construction was being performed by subcontractors. To an extent, T-3 was merely the conduit through which the money flowed. T-3 was hired to manage the construction of the building; as part of that duty, it hired, and therefore also had to pay, subcontractors to perform work on the building. As such, it would be reasonable to conclude that the money was being utilized by T-3 to pay subcontractors in the course of its management of the construction, and was not paid to T-3 for any product it was personally constructing. Indeed, we have not been pointed to anything in the record indicating that T-3 performed any of the construction, and it conceded at oral argument that it had no design authority. As such, it does not seem reasonable to conclude that because only approximately $176,000 of the $6 million contract was specifically allocated to pay T-3 for its construction management services, that this was actually a contract for a product and not a contract for services.

*Id.*, ¶ 19.

¶ 20. The court of appeals also held that Westport's professional liability policy provided coverage for 1325's breach-of-contract claims against T-3. *Id.,* ¶ 2. In the court of appeals' words, "the broad grant of coverage in the professional liability policy cannot be interpreted to limit coverage in the way Westport advocates." *Id.,* ¶ 40.

> 1325 has alleged a number of "negligent acts, errors, or omissions in the performance of [T-3's] 'professional services' " in its complaint. These allegations not only assert a breach of contract *and* a failure to exercise the requisite standard of care, but also trigger the professional liability policy's coverage for T-3's "wrongful acts." If T-3 did not expect to be held liable for any damages that may result from failing to provide adequate professional services, should such allegations be raised and proven, what, then, would be the purpose of *professional liability* insurance?

*Id.,* ¶ 42 (emphasis in original). The court of appeals also concluded that neither of the exclusions raised by Westport is applicable.

¶ 21. T-3 and Westport petitioned for review, challenging the court of appeals' holding that the economic loss doctrine does not apply. Additionally, Westport contests the court of appeals' holding that its policy provides coverage against 1325's breach-of-contract claims. We granted review, and now reverse on the petition for review and affirm on the cross-petition for review.

## II

¶ 22. "We review a circuit court's grant of summary judgment independently, applying the same methodology as the circuit court." *Smaxwell v. Bayard,* 2004

WI 101, ¶ 12, 274 Wis. 2d 278, 682 N.W.2d 923 (citing *Town of Delafield v. Winkelman,* 2004 WI 101, ¶ 15, 269 Wis. 2d 109, 675 N.W.2d 470). Pursuant to Wis. Stat. § 802.08(2) (2003–04), summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "We view the summary judgment materials in the light most favorable to the nonmoving party." *Smaxwell,* 274 Wis. 2d 278, ¶ 12 (citing *Torgerson v. Journal/Sentinel, Inc.,* 210 Wis. 2d 524, 537, 563 N.W.2d 472 (1997)). "Summary judgment should not be granted, 'unless the facts presented conclusively show that the plaintiff's action has no merit and cannot be maintained.' " *Id.* (quoting *Goelz v. City of Milwaukee,* 10 Wis. 2d 491, 495, 103 N.W.2d 551 (1960)). "Where the material facts are not disputed, the court is presented solely with a question of law, subject to de novo review." *Id.* (citing *Winkelman,* 269 Wis. 2d 109, ¶ 16).

¶ 23. Additionally, we review the circuit court's decision to grant declaratory judgment to Westport. The granting or denying of relief is a matter within the discretion of the circuit court. *Progressive No. Ins. Co. v. Romanshek,* 2005 WI 67, ¶ 8, 281 Wis. 2d 300, 697 N.W.2d 417. " 'This court reviews such decisions to determine whether the circuit court erroneously exercised its discretion. If the circuit court proceeds on an erroneous interpretation of the law, the exercise of discretion is erroneous.' " *Id.* (quoting *Theis v. Midwest Sec. Ins. Co.,* 2000 WI 15, ¶ 8, 232 Wis. 2d 749, 606 N.W.2d 162). Furthermore, whether an insurance policy affords coverage and whether an insurer has a duty to

defend are questions of insurance contract interpretation subject to de novo review. *Everson v. Lorenz,* 2005 WI 51, ¶ 11, 280 Wis. 2d 1, 695 N.W.2d 298.

## III

¶ 24. We begin with a brief overview of the economic loss doctrine. " 'The economic loss doctrine is a judicially created doctrine under which a purchaser of a product cannot recover from a manufacturer on a tort theory for damages that are solely economic.' " *Linden v. Cascade Stone Co.,* 2005 WI 113, ¶ 6, 283 Wis. 2d 606, 699 N.W.2d 189 (quoting *Bay Breeze,* 257 Wis. 2d 511, ¶ 9). "Economic loss is generally defined as damages resulting from inadequate value because the product is 'inferior and does not work for the general purposes for which it was manufactured and sold.' " *Daanen & Janssen, Inc. v. Cedarapids, Inc.,* 216 Wis. 2d 395, 400–01, 573 N.W.2d 842 (1998) (quoting *Northridge Co. v. W.R. Grace & Co.,* 162 Wis. 2d 918, 925–26, 471 N.W.2d 179 (1991)). "Economic loss may be either direct or consequential. Direct economic loss is loss in value of the product itself. All other economic loss caused by the product defect, such as lost profits, is consequential economic loss." *Wausau Tile, Inc. v. County Concrete Corp.,* 226 Wis. 2d 235, 246, 593 N.W.2d 445 (1999) (internal quotations and citations omitted). "Economic damages do not include losses due to personal injury or damage to other property."[7] *Linden,* 283 Wis. 2d 606, ¶ 6.

¶ 25. Three principles generally underlie the application of the economic loss doctrine to tort actions

---

[7] In this case, 1325 asserts property damage only to the building itself or its components.

between commercial parties: "(1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk." *Daanen & Janssen,* 216 Wis. 2d at 403.

¶ 26. In this case, the property damage suffered by 1325 amounts to nothing more than construction defects and damage to work and materials ultimately within the subject matter of the contract. In other words, only the building or components incorporated into the building were damaged and the express warranty bargained by the parties applies.

¶ 27. Furthermore, 1325 and T-3 are two commercially sophisticated parties that drafted a detailed 102–page written contract specifically allocating the risk of the loss and the available remedies under the terms of the contract. These risk allocations and remedy provisions include, among others, the following: a broad form express warranty; an insurance and bonding requirement; a broad form indemnification agreement; authority by 1325's architect to reject nonconforming work; a provision relating to withholding compensation in the event of the termination of T-3; and a provision for exclusion from T-3's reimbursement costs of the work. It is difficult to conceive what else the parties could have done with respect to the risk allocation and remedies in the event of a breach of contract.

¶ 28. The written, bargained-for nature of the contract; the sophistication of the parties; the commercial nature of the transaction; the representation of the parties by counsel; and the fact that the parties had the opportunity to bargain for a warranty, the available

remedies, and the allocation of risk all weigh heavily for the application of the economic loss doctrine. Considering the above facts, this case seems "tailor made for the application of traditional contract law."[8] *Van Lare v. Vogt, Inc.,* 2004 WI 110, ¶ 21, 274 Wis. 2d 631, 683 N.W.2d 46.

¶ 29. With these preliminary considerations in mind, we now examine the contract under the *Linden* analysis.[9] First, we consider the nature of the contract. That is, we must determine whether the contract was one for products, services, or a mixed contract encompassing both products and services. "Interpreting the nature of a contract presents a question of law subject

---

[8] This discussion of the underlying transaction and the all-inclusiveness of the contract merely underscores why, under the three main policy rationales of the economic loss doctrine, our application of the economic loss doctrine in this case is consistent with the policies driving the doctrine. It should not be interpreted as a separate basis for our holding that the economic loss doctrine applies to the contract between T-3 and 1325. Our holding is based on an application of *Linden v. Cascade Stone Co.,* 2005 WI 113, 283 Wis. 2d 606, 699 N.W.2d 189.

[9] Contrary to the dissent's lament and trite reference to *The Blob,* this decision does not implicate a wild expansion of the economic loss doctrine. We are simply applying the test laid out in *Linden.* If anything, the *Linden* decision went further than we do today. In *Linden,* we applied the economic loss doctrine to the homeowners' negligence claims against the subcontractors hired by the general contractor even though there was no privity of contract. In this case, however, there was a direct contractual relationship between T-3 and 1325, wherein the parties detailed specific risk allocations and remedy provisions. In any event, although the dissent may continue to believe *Linden* was misguided, it is the law in Wisconsin.

to independent appellate review." *Cease Elec.,* 276 Wis. 2d 361, ¶ 14. If the contract is purely a service contract, the economic loss doctrine does not apply. *Id.,* ¶ 52 (creating a bright-line rule that the economic loss doctrine does not apply "to claims for the negligent provision of services"). However, if the contract is a mixed contract for products and services, whether the economic loss doctrine applies depends upon whether the contract is predominantly for a product or for services. *Linden,* 283 Wis. 2d 606, ¶ 8.

¶ 30. T-3 contends that the court of appeals erred in characterizing the contract as one purely for services.[10] It argues that the court reached its erroneous conclusion by narrowly focusing on the work personally performed by T-3, rather than the full scope of T-3's contract and the finished product T-3 was contractually obligated to deliver. T-3 contends the contract is mixed in nature, and further, under the predominant purpose test, T-3 asserts the contract is predominantly one for a product and therefore subject to the economic loss doctrine.

¶ 31. 1325 argues the contract is purely a service contract, as T-3 was hired for its construction management services and therefore the contract is controlled by the holding of *Cease Electric. Linden* cannot apply, 1325 asserts, because unlike the builder in *Linden,* T-3 never delivered a product since its negligent construction management prevented a product from existing at the time 1325 terminated T-3.

¶ 32. Contrary to 1325's arguments and the decision of the court of appeals, we have little difficulty in

---

[10] We note that Westport also briefed the applicability of the economic loss doctrine. Essentially, Westport's brief echoes the arguments of T-3, and for simplicity we refer solely to T-3 in this portion of the discussion.

concluding that the contract is, at a minimum, not a pure services contract, especially given that the contract clearly discusses both services and products to be furnished. In our view, the contract is closely analogous to the mixed contract in *Linden* rather than the pure service contract in *Cease Electric.*

¶ 33. In *Cease Electric,* 276 Wis. 2d 361, ¶ 3, electricians were hired to wire a ventilation system for a chicken barn. The customer supplied the ventilation system and all essential materials. *Id.,* ¶ 7. The contract was oral and grew out of an informal, long-standing business relationship. *Id.,* ¶ 3. Furthermore, the electricians were paid by the hour. *Id.,* ¶ 19. Noting that all the electricians were required to do "was to follow the one-page wiring schematic to ensure that the controller was properly wired[,]" we had little difficulty concluding the contract was purely for services. *Id.,* ¶¶ 18–21.

¶ 34. By contrast, in *Linden,* the Lindens entered into a written contract with Groveland, a general contractor, to build a new home. Groveland, in turn, hired two subcontractors, Cascade and Fern, to apply exterior stucco to the house and to shingle the house's roof. *Linden,* 283 Wis. 2d 606, ¶ 2. The house suffered from water infiltration, and the Lindens sued Groveland and the subcontractors for breach of contract, breach of warranty, and negligence. *Id.,* ¶ 3. After Groveland settled, Cascade and Fern moved for summary judgment, contending that the economic loss doctrine barred the Lindens' tort claims. *Id.,* ¶ 4. The circuit court granted summary judgment, and we affirmed.

¶ 35. We then concluded that the general contract, not the subcontracts, controlled the analysis of whether a contract is primarily for goods or services.

432

*Id.,* ¶ 17. Notably, we readily established the contract encompassed both products and services and moved to the question of whether products or services were the predominant feature of the contract. *See id.,* ¶ 8. Applying the predominant purpose test, we concluded that under the totality of the circumstances the predominant purpose of the contract was for a new house rather than one for services. *Id.,* ¶ 25.

¶ 36. As was the case in *Linden,* we believe it apparent that the T-3/1325 contract is mixed in nature for a number of reasons. First, the parties used an AIA Standard Form Agreement for the project—AIA Document A121/CMc Standard Form of Agreement Between Owner and Construction Manager Where the Construction Manager is Also the Constructor.

¶ 37. According to the AIA, under the CMc arrangement, "the functions of contractor and construction manager are merged and assigned to one entity that may or may not give a guaranteed maximum price, but who typically assumes control over the construction work by direct contracts with the subcontractors." *See* http://www.aia.org/docs_chart. Additionally, the AIA describes the contract as follows:

> A121/CMc is intended for use on projects where a construction manager, in addition to serving as advisor to the owner, assumes financial responsibility for construction of the project. The construction manager provides the owner with a guaranteed maximum price proposal, which the owner may accept, reject, or negotiate. Upon the owner's acceptance of the proposal by execution of an amendment, the construction manager becomes contractually bound to provide labor and materials for the project.

http://www.aia.org/docs_family_constructionmanager construtor.

This language supports T-3's claim that it was hired to act in a dual role and was not hired strictly for its construction management services.

¶ 38. Furthermore, "The Project" is defined in the General Conditions of the contract as "*the total construction* of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner or by separate contractors." (Emphasis added.) The term "Work," in turn, means "the *construction and services* required by the Contract Documents . . . and includes all other *labor, materials, equipment and services* provided or to be provided by the Contractor to fulfill the Contractor's obligations." (Emphasis added.) This language demonstrates T-3's contractual obligation to deliver all of the materials and services for a completed 42–unit condominium complex and not just construction management services.

¶ 39. This case is also unlike *Cease Electric,* in that 1325 did not supply T-3 with all the essential components necessary to construct the condominium complex. Rather, as was true for the general contractor in *Linden,* T-3 was contractually obligated to furnish all of the component parts of the building and to perform all of the actual construction work, whether using its own personnel, subcontractors or a combination thereof. The entirety of the construction work, including all labor and materials necessary to deliver the completed building, was within the scope of T-3's contract.

¶ 40. Additionally, T-3 was at risk financially for the completed product, which demonstrates that the contract was, at a minimum, not a pure services contract. The fact that T-3 assumed the risk of completing the project on budget belies the court of appeals' char-

acterization of T-3 as "merely the conduit through which the money flowed[]" between 1325 and the subcontractors. *1325 N. Van Buren,* 284 Wis. 2d 387, ¶ 19.

¶ 41. Furthermore, it does not matter for purposes of our analysis that T-3 never delivered a "final" product to 1325 because 1325 terminated T-3 before any product could be delivered. We note that adopting 1325's reasoning would give parties to a contract a high incentive to terminate a problematic relationship prior to completion in order to take advantage of tort remedies as opposed to relying on their own bargained-for remedies.

¶ 42. Having concluded that the T-3/1325 contract is mixed, we next turn to determining whether the mixed contract is predominantly for a product or services. Whether a contract is primarily for goods or services and whether the economic loss doctrine precludes a claim are questions of law subject to de novo review. *Linden,* 283 Wis. 2d 606, ¶ 5. In deciding the predominant purpose of a contract, this court uses "the totality of the circumstances test, which includes both quantitatively objective and subjective factors." *Id.,* ¶ 18. Among the factors this court considers are: "the language of the contract, the nature of the business of the supplier, the intrinsic worth of the materials, the circumstances of the parties, and the primary objective they hoped to achieve by entering into the contract." *Id.,* ¶ 21.[11]

---

[11] In *Linden,* we collected these factors from other jurisdictions as examples of what other courts had looked at in determining the predominant purpose of a contract. However, we focused our attention primarily on two factors—the primary objective the parties hoped to achieve and the fixed contract

¶ 43. In *Linden,* we concluded a contract to construct a new house was predominantly for a product. *Id., ¶* 25. We first noted that almost $100,000 of the roughly $360,000 total cost of the home was for lumber, but otherwise the contract did not provide all of the costs broken down into services and materials. *Id., ¶* 23. Next, we stated that although the contract was couched in terms of service words and product words, "the primary reason the Lindens entered into the contract was to have a house custom built for them." *Id., ¶* 25. Furthermore, the project was billed as a " 'fixed price contract,' not changing based on the hours worked, but only on changes in the specifications. . . . This shows that the parties bargained for costs based on the specifications of the house, not the amount of work put into completion of the project." *Id.* With these considerations in mind, we concluded that under the totality of the circumstances, the predominant purpose of the contract was for a new house. *Id.*

¶ 44. 1325 contends the contract was predominantly for services because T-3 was hired for its construction management expertise, which it claims is a professional service. The product, 1325 reasons, was supplied by the subcontractors, which built the condominium complex. Therefore, the predominant purpose of the contract was to procure T-3's construction management services. If the purpose were simply to procure the condominium complex, 1325 argues it would have simply hired a general contractor rather than a construction manager. 1325 also discounts the significance of the product-oriented language by observing that every construction service contract necessarily contains

_____

price—in concluding that the contract was primarily for the construction of a house. *Linden,* 283 Wis. 2d 606, ¶ 25.

a description of the thing to be built. Therefore, 1325 reasons, the court should not attribute any significance to such language.

¶ 45. We disagree with 1325. Applying the *Linden* analysis to the contract at hand, we conclude the predominant purpose of the T-3/1325 contract was to provide a completed condominium complex rather than to provide construction management services. There are a number of facts that lead us to this conclusion.

¶ 46. First, under the plain language of the contract, "The Project" was the "[r]enovation of a warehouse into a 42–unit condominium and construction of adjacent parking garages." In other words, T-3 was contractually obligated to deliver to 1325 a series of condominiums and parking garages by first completing a major deconstruction of an existing ice cream warehouse down to its structural skeleton before beginning the substantial reconstruction of the upscale condominiums with the attached parking garage.

¶ 47. The pricing of the contract also supports our conclusion that the parties bargained for the completed condominium project, not the amount of work and services necessary to complete the project. The contract fee for T-3's construction management services was only $176,000, or 2.8 percent of the $6,099,891 total contract price. Furthermore, the contract was for a guaranteed maximum price. 1325 contends that the guaranteed maximum price in this contract is not analogous to the fixed price contract in *Linden*. 1325 argues that the contract guaranteed T-3 a profit because it specified a fixed management fee of $176,000; however, this argument disregards the possibility that the project cost overruns could exceed the construction management fee, thereby resulting in a loss to the construction manager. Therefore, we conclude that the contract

pricing is comparable to the fixed price contract in *Linden,* and as we concluded in *Linden,* a fixed price contract signifies that the parties bargained based on the specifications of the condominium complex not the amount of work required to complete the project. In other words, T-3 was not simply responsible for providing its construction management services; rather, it was responsible for supplying the condominium complex.

¶ 48. Next, 1325's process of bidding for the project suggests 1325 viewed the contract as one for a finished product not construction management services. The depositions of Thomas DeMuth and Brett Grasse, members of Lighthouse Development Company, LLC, which is the managing member of 1325, demonstrate that 1325 decided to whom to award the project based on overall project price. We can find nothing in the record that suggests the expense of construction management services was a factor. This seems especially true given: (1) DeMuth considered David Schmidt of C.G. Schmidt—a competitor of T-3—a friend, with whose expertise he was familiar; (2) 1325 was prepared to proceed with the project under C.G. Schmidt; and (3) nevertheless, 1325 awarded the Contract to T-3—of whom 1325 had no personal knowledge —because it proposed to complete the project for $6.1 million as opposed to C.G. Schmidt's $6.8 million price. This objective evidence weighs in favor of our conclusion that 1325 was primarily purchasing the completed project, not construction management services despite 1325's contentions to the contrary.

¶ 49. Furthermore, our conclusion that the predominant purpose of the contract was to provide a product is consistent with 1325's understanding of the contract. At DeMuth's deposition, T-3's attorney asked the following question: "Is it your understanding then

that pursuant to the warranty provision, T-3 was to deliver a fully completed building, a 42–unit condominium complex with parking garage, in accordance with the contract that was free of defects and with good quality, new materials?" To this question, DeMuth answered "Yes." In other words, 1325 viewed its contract with T-3 as a contract for a completed product: the condominium complex with construction management services incidental to the ultimate purpose of the contract.

¶ 50. In sum, applying the *Linden* analysis, we conclude the predominant purpose of the T-3/1325 contract was to provide a condominium complex rather than to provide construction management services; therefore, the contract is subject to the economic loss doctrine as 1325 has suffered solely economic losses.[12] We therefore reverse the court of appeals with respect to T-3's appeal.

## IV

¶ 51. Next, we address whether Westport's professional liability insurance policy[13] provides coverage for 1325's breach of contract claim. "The interpretation of

---

[12] The dissent accuses us of selectively focusing on portions of the record that support our decision. Notably however, in its "analysis" the dissent has not provided any contrary portions of the record for support of its determination that the predominant purpose of the contract is for services. The dissent mainly refers back to the decision of the court of appeals, which did not have the *Linden* decision at its disposal.

[13] The professional liability policy Westport issued to T-3 is the sort of policy issued to many professionals, including attorneys, accountants, engineers, and real estate brokers. 8 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance,* § 1.34

words or clauses in an insurance policy and the existence of coverage under that policy are questions of law which we review de novo." *Doyle v. Engelke,* 219 Wis. 2d 277, 283–84, 580 N.W.2d 245 (1998) (citations omitted). "Insurance polices are construed as they would be understood by a reasonable person in the position of the insured. However, we do not interpret insurance policies to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium." *Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.,* 2004 WI 2, ¶ 23, 268 Wis. 2d 16, 673 N.W.2d 65 (citations omitted).

¶ 52. In determining whether coverage exists, we first "examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage." *Am. Girl,* 268 Wis. 2d 16, ¶ 24; *see also Bankert v. Threshermen's Mut. Ins. Co.,* 110 Wis. 2d 469, 480, 329 N.W.2d 150 (1983) (a court first focuses on the incident allegedly giving rise to coverage—not the theory of liability—to determine whether the incident comes within the coverage afforded by the policy). Then, "[i]f the claim triggers the initial grant of coverage in the insuring agreement, we next examine the various exclusions to see whether any of them preclude coverage of the present claim." *Am. Girl,* 268 Wis. 2d 16, ¶ 24.[14]

---

(3d ed. 2004). "Generally, a policy of liability insurance issued to professional persons or entities protects them against liability for malpractice, error, or mistake that occurs in the course of their professional duties." 46 C.J.S. *Insurance* § 955 (1993).

[14] Westport did not petition for review of the court of appeals' determination that the exclusions in its policy do not apply; therefore, we address the first question only: whether 1325's claim comes within the policy's initial grant of coverage.

¶ 53. We begin with the language of Westport's insurance contract. The insuring agreement states that Westport "shall pay on behalf of any insured all 'loss' in excess of the deductible which any insured becomes legally obligated to pay as a result of 'claims' first made against any insured during the 'policy period' . . . by reason of any 'wrongful act[.]' " "Wrongful act," in turn, is defined as "any actual or alleged negligent act, error or omission in the performance of 'professional services' for others by an insured[.]" Thus, whether Westport must indemnify T-3 turns on whether T-3 is "legally obligated to pay" as a result of 1325's contract claim against T-3 "by reason of any negligent act, error or omission."

¶ 54. Westport's primary contention is that 1325's breach of contract claim does not fall within the policy's initial grant of coverage. As negligent modifies "act," "error," and "omission," Westport argues that coverage exists only for losses caused by negligence. Coverage is further limited because even if there is a negligent act, coverage exists only if the insured could be liable on a negligence claim. This is true, Westport reasons, because the policy insures against claims that the insured "becomes legally obligated to pay," which connotes tort liability, not contractual liability. Accordingly, in Westport's view, because the economic loss doctrine bars 1325 from seeking relief under a negligence cause of action, T-3's policy affords no coverage.[15]

---

[15] Westport also argues that 1325 should have sought a performance bond. This argument is a red herring, however, as it does not matter what 1325 could have or should have done with respect to protecting itself. What matters is what coverage Westport's insurance policy affords to T-3.

441

¶ 55. 1325 contends that Westport's interpretation of the policy is far too narrow given that a professional liability insurance policy is meant to protect against malpractice, and malpractice claims may sound in either contract or tort. *McMahon v. Brown,* 125 Wis. 2d 351, 353, 371 N.W.2d 414 (Ct. App. 1985). In other words, 1325 argues, how a malpractice claim is pled—in tort or contract—does not matter for purposes of determining whether a policy affords coverage. What matters is whether the complaint alleges T-3 failed to provide competent professional services, such that the allegations bring the claim within the scope of coverage dictated by the policy language.

¶ 56. As to the language of the policy itself, 1325 argues that in the phrase "negligent act, error or omission," negligent modifies "act" but not "error" or "omission." 1325 claims that Westport's interpretation renders the terms error and omission as mere superfluous duplication of the concept of negligent, contrary to the "established rule that a contract is to be construed so as to give a reasonable meaning to each provision of the contract, and that courts must avoid a construction which renders portions of a contract meaningless, inexplicable or mere surplusage." *Goebel v. First Fed. Sav. and Loan Ass'n of Racine,* 83 Wis. 2d 668, 680, 266 N.W.2d 352 (1978) (citations omitted). Furthermore, 1325 argues that it is well settled in Wisconsin that we must interpret the words in a contract as "a reasonable person in the position of the insured would have understood the words to mean[,]" *State Farm Mutual Automobile Insurance Co. v. Langridge,* 2004 WI 113, ¶ 15, 275 Wis. 2d 35, 683 N.W.2d 75, and in this case a reasonable insured would not understand the term negligent act as being limited to an actionable wrong pled in tort.

442

¶ 57. We agree with 1325 and conclude that Westport's professional liability policy provides coverage for 1325's breach of contract claim against T-3. 1325's claim clearly fits within the insuring agreement as it is based on a "negligent act, error or omission" of T-3 in its failure to adhere to professional standards, sounding in negligence, but arising in the context of a contract between 1325 and T-3. The policy is in no way limited to negligence *claims*. A breach of contract claim, as pled in 1325's amended complaint, can also arise from negligent acts, errors or omissions.

¶ 58. We have repeatedly rejected the argument that insurance coverage is dependent upon the theory of liability. *See Am. Girl,* 268 Wis. 2d 16, ¶¶ 35–36; *Bankert,* 110 Wis. 2d at 480. In *American Girl,* American Girl contracted with a general contractor to have a warehouse built. *Am. Girl,* 268 Wis. 2d 16, ¶ 3. Because a soil-engineering subcontractor gave faulty site-preparation advice to the general contractor, the warehouse suffered such extreme settling that it had to be torn down. *Id.* Although American Girl's contract with the general contractor included a warranty, American Girl sued the general contractor, claiming that the subcontractor's negligence caused the general contractor to breach the contract. *Id.,* ¶ 17. American Family provided the general contractor's CGL insurance, which required the insurer to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *Id.,* ¶ 31. The bodily injury or property damage further had to be caused by an "occurrence." In *American Girl,* the threshold issue was whether the insuring agreement conferred coverage,

443

which depended on whether there had been "property damage" resulting from an "occurrence." *Id.*, ¶ 32.

¶ 59. We first held that although the economic loss doctrine may limit a party to contract rather than tort remedies, it does not determine insurance coverage. *Id.*, ¶ 35. Insurance coverage depends upon the policy language, not the theory of liability. *Id.* The issue of whether the economic loss doctrine precluded the tort recovery was not before us, but we concluded the following:

> To the extent that American Family is arguing categorically that a loss giving rise to a breach of contract or warranty claim can *never* constitute "property damage" within the meaning of the CGL's coverage grant, we disagree. The language of the CGL policy and the purpose of the CGL insuring agreement will provide coverage for claims sounding in part in breach-of-contract/breach-of-warranty under some circumstances. This is such a circumstance.

*Id.*, ¶ 36 (emphasis in original) (internal quotations and citation omitted).

¶ 60. Thus, this case refutes Westport's contention that "legally obligated to pay" connotes only tort liability as we concluded the CGL policy would "provide coverage for claims sounding in part in breach-of-contract/breach-of-warranty under some circumstances." *Id.*

¶ 61. Additionally, we determined that the CGL policy afforded coverage for a breach of contract claim based on an "occurrence," where occurrence was defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.*, ¶ 37. American Family argued that because American Girl's claim was for a breach of contract/breach of warranty it could not be an occur-

rence because "the CGL is not intended to cover contract claims arising out of the insured's defective work or product." *Id.,* ¶ 39. While agreeing in principle with this proposition, we stated that "this is by operation of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an 'occurrence' within the meaning of the CGL's initial grant of coverage." *Id.* Furthermore, we noted the following:

> [T]here is nothing in the basic coverage language of the current CGL policy to support any definitive tort/ contract line of demarcation for purposes of determining whether a loss is covered by the CGL's initial grant of coverage. "Occurrence" is not defined by reference to the legal category of the claim. The term "tort" does not appear in the CGL policy.

*Id.,* ¶ 41.

¶ 62. We find this reasoning of *American Girl* persuasive to this case. As an "occurrence" in the CGL policy of *American Girl* was not defined by a tort claim, so too "wrongful act" in Westport's professional liability policy is not defined by a tort claim. Under Westport's policy, at most a "wrongful act" is a "negligent act" but this is entirely different from a claim of negligence.[16] It is entirely possible that one could do a negligent act,

---

[16] As stated by the Supreme Judicial Court of Massachusetts:

> Other courts have not limited liability under 'errors and omissions' policies to circumstances involving negligence, but have recognized certain nonnegligent errors as being within the coverage afforded. . . . Cases involving the words such as 'negligent act, error or omission' . . . have not consistently determined that an error must be a negligent one if coverage is to be available.

*USM Corp. v. First State Ins. Co.,* 652 N.E.2d 613, 614 (Mass. 1995) (collecting cases).

which would form the basis for a breach of contract claim. It would be an easy matter to have the insurance policy state that it does not cover facts that arise out of what is a breach of contract, if that was indeed Westport's intention.

¶ 63. However, the insuring agreement is clearly not so narrowly defined. Indeed, the terms "loss" and "claim" are quite broad. Loss is defined as "the monetary and compensatory portion of any judgment, award or settlement[.]" Claim is defined as "a demand made upon you for loss[.]" As the court of appeals put it, "the broad grant of coverage in the professional liability policy cannot be interpreted to limit coverage in the way Westport advocates." *1325 N. Van Buren,* 284 Wis. 2d 387, ¶ 40.

¶ 64. Westport's interpretation is also not in harmony with some of the exclusions in its policy. In interpreting and construing an insurance policy, we must consider the policy as a whole to give reasonable meaning to the entire policy. *Berg v. Schultz,* 190 Wis. 2d 170, 175, 526 N.W.2d 781 (Ct. App. 1994). As 1325 notes, if Westport's insuring clause excludes all claims asserted as breaches of contract, it is not necessary for the policy to include Exclusion K, which states that the policy does not apply to any claim "arising out of, attributable to, or directly or indirectly resulting from express warranties or guarantees." Similarly, Exclusion L limits coverage for contract indemnity. Essentially, these exclusions would be superfluous if the policy could never afford coverage for breach of contract claims.

¶ 65. On its face, 1325's amended complaint sufficiently alleges "wrongful acts" of T-3 sufficient to trigger Westport's coverage. 1325 has pled not only that

T-3 acted negligently, but that its damages were caused by T-3's "negligent errors and omissions[.]" To date, Westport has not attempted to controvert 1325's assertions that T-3's construction management services did not meet industry standards. Rather, Westport has rested its claim that its policy does not afford coverage on the argument that the economic loss doctrine precludes 1325 from recovering in tort and that its policy does not cover breach-of-contract liability. Deciding this issue without the benefit of *American Girl*, the circuit court accepted Westport's argument. As the discussion of *American Girl* demonstrates, however, coverage is not dependent upon the theory of liability pled by a party.

¶ 66. In sum, because 1325 has alleged and presented facts that T-3's "negligent acts, errors and omissions" caused T-3 to breach the contract, thereby triggering the coverage in Westport's professional liability policy, we affirm the court of appeals' decision that Westport's policy provides coverage to T-3.[17]

## V

¶ 67. We conclude that the economic loss doctrine applies to the mixed contract between T-3 and 1325 as the predominant purpose of the contract was to construct a 42–unit condominium complex with adjacent parking garages. Furthermore, Westport has a duty to

---

[17] Because we conclude that Westport has a duty to potentially indemnify T-3, Westport also has a duty to defend T-3. *See Fireman's Fund Ins. Co. v. Bradley Corp.*, 2003 WI 33, ¶ 20, 261 Wis. 2d 4, 660 N.W.2d 666. ("The duty to defend is necessarily broader than the duty to indemnify because the duty to defend is triggered by arguable, as opposed to actual, coverage.").

defend and potentially indemnify T-3 for its breach of contract claim under our interpretation of its professional liability insurance contract. As such, the decision of the court of appeals is reversed with respect to T-3's appeal, affirmed with respect to Westport's cross-appeal, and remanded to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed in part, affirmed in part, and remanded.

¶ 68. ANN WALSH BRADLEY, J. (*dissenting*). "Like the ever-expanding, all-consuming alien life form portrayed in the 1958 B-movie classic *The Blob,* the economic loss doctrine seems to be a swelling globule on the legal landscape of this state." *Grams v. Milk Prods., Inc.,* 2005 WI 112, ¶ 57, 283 Wis. 2d 511, 699 N.W.2d 167 (Abrahamson, C. J., dissenting).

¶ 69. These words ring as true now as they did a year ago. The majority of this court once again expands the already-swollen body of economic loss doctrine jurisprudence in Wisconsin. That jurisprudence continues to devour unsuspecting tort claims that it finds in its path. Like the Blob, the more it eats, the more it grows.

¶ 70. I am hardly alone in my concern for the unbridled expansion of the economic loss doctrine in this state. Recently, legal commentary has critiqued Wisconsin's approach to the development of the economic loss doctrine.

¶ 71. For example, in an award-winning article highlighting the instability in the law that this court's economic loss doctrine cases have engendered, the authors observe: "Over the last decade . . . the doctrine's application has been radically expanded, narrowing and in some cases effectively eliminating a variety of common-law tort causes of action."

R. Thomas Cane & Sheila Sullivan, *More Litigation to Come: Exceptions to the Economic Loss Doctrine,* 78 Wis. Lawyer 10, 10 (Nov. 2005).[1]

¶ 72. At oral argument, counsel for 1325 advised that Wisconsin leads the nation in the number of cases involving the economic loss doctrine, far outpacing almost all other jurisdictions:

> [T]here's been an awful lot of them. A tremendous number of them. In fact, I did a []search just before I came here, putting in the term "economic loss doctrine" in all the states and the state with the most case law by far is this state. By far. I mean, you outrank New York, you outrank California, Texas. I mean, Florida comes close . . . .

*See also* John J. Laubmeier, *Demystifying Wisconsin's Economic Loss Doctrine,* 2005 Wis. L. Rev. 225, 225 ("The doctrine . . . was at issue in the Wisconsin Court of Appeals or the Wisconsin Supreme Court forty-seven times between 2000 and 2004.").

¶ 73. Only Florida rivals Wisconsin in its use of the economic loss doctrine.[2] The Supreme Court of Florida, however, recently reversed course, retreating

---

[1] For discussion and criticism of the expansion of the economic loss doctrine in jurisdictions in addition to Wisconsin, see Daniel Rapaport, et al., *Tort Killer: The Applicability of the Economic Loss Doctrine to Service Contracts,* 20 Me. B. J. 100 (Summer 2005); R. Joseph Barton, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims,* 41 Wm. & Mary L. Rev. 1789 (May 2000); Paul J. Schwiep, *The Economic Loss Rule Outbreak: The Monster that Ate Commercial Torts,* 69 Fla. B. J. 34 (Nov. 1995).

[2] My electronic search yielded results similar to those of 1325's counsel. In my search, only Florida topped Wisconsin in number of cases citing "economic loss doctrine" or "economic loss rule."

from an expansive approach to the doctrine. Acknowledging error, it now endorses a return to the principles underlying the doctrine's origins.[3]

¶ 74. Nonetheless, a majority of this court demonstrates—yet again—its willingness to continue to expand the economic loss doctrine far beyond its principled origins.[4] The majority of this court is increasingly out of step with any sensible approach to the doctrine that can be justified based on its origins in commercial products liability.[5] Accordingly, I respectfully dissent.

---

[3] More specifically, the Supreme Court of Florida explained as follows in *Moransais v. Heathman,* 744 So. 2d 973, 983 (Fla. 1999):

> Today, we again emphasize that by recognizing that the economic loss rule may have some genuine, but limited, value in our damages law, we never intended to bar well-established common law causes of action, such as those for neglect in providing professional services. Rather, the rule was primarily intended to limit actions in the product liability context, and its application should generally be limited to those contexts or situations where the policy considerations are substantially identical to those underlying the product liability-type analysis.

*Accord Indemnity Ins. Co. v. American Aviation, Inc.,* 891 So. 2d 532, 542 (Fla. 2004) ("We now agree that the economic loss rule should be expressly limited.").

[4] *See also, e.g., Linden v. Cascade Stone Co.,* 2005 WI 113, ¶ 37, 283 Wis. 2d 606, 699 N.W.2d 189 (Bradley, J., dissenting) ("[T]he majority has once again expanded the economic loss doctrine well beyond its principled origins of products liability."); *Grams v. Milk Prods., Inc.,* 2005 WI 112, ¶ 58, 283 Wis. 2d 511, 699 N.W.2d 167 (Abrahamson, C. J., dissenting) ("Courtesy of this majority opinion and other opinions of this court, this legal doctrine with modest, or even 'obscure' beginnings, is fast growing.") (footnotes omitted).

[5] *See Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.,* 148 Wis. 2d 910, 921, 437 N.W.2d 213 (1989) (holding

## I

¶ 75. Today the majority applies the economic loss doctrine based on a contract for "construction management *services*" to "substantially renovat[e] an existing industrial warehouse into a 42–unit condominium building with attached parking garages." Majority op., ¶¶ 2, 5, 7. (Emphasis added.) Its decision purports to be grounded in the "predominant purpose" test that this court adopted in *Linden v. Cascade Stone Co.,* 2005 WI 113, 283 Wis. 2d 606, 699 N.W.2d 189, a case in which I dissented.

¶ 76. I continue to believe that the court's decision in *Linden* was misguided. In *Linden,* the same majority of the court applied this "predominant purpose" test to a contract for the construction of a new home. *Linden,* 283 Wis. 2d 606, ¶¶ 8–11. A fundamental problem with *Linden* was that the majority used one party's contract to bar the tort claims of another with whom there was no contract. *Id.,* ¶ 36 (Bradley, J., dissenting).[6]

¶ 77. Now the majority makes apparent that *Linden* has another fundamental problem. The test from

that "a commercial purchaser of a product cannot recover solely economic losses from the manufacturer under negligence or strict liability theories, particularly . . . where the warranty given by the manufacturer specifically precludes the recovery of such damages"); *see also* R. Thomas Cane & Sheila Sullivan, *The Future of the Economic Loss Doctrine in Wisconsin,* 78 Wis. Lawyer 13, 14 (May 2005) ("The economic loss doctrine is, in its purest form, a judicially created doctrine that bars commercial purchasers of goods from recovering solely economic losses from manufacturers under tort theory.").

[6] *Cf. Trinity Lutheran Church v. Dorschner Excavating, Inc.,* 2006 WI App 22, ¶¶ 19–20, 289 Wis.2d 252, 710 N.W.2d 680 (holding that the economic loss doctrine does not apply

*Linden* can be difficult to apply and is a malleable means for the majority to achieve its desired economic loss doctrine ends.

¶ 78. Even granting the majority the predominant purpose test, I would still not reach the result the majority reaches today. I would decline to apply the economic loss doctrine because I would conclude that the contract was predominantly for services.

## II

¶ 79. The majority's continued expansion of the economic loss doctrine is signaled by its initial focus on a number of "preliminary considerations." Majority op., ¶ 29. Many of these considerations have nothing to do with whether a contract is one for a product, one for services, a mixed contract that was predominantly for a product, or a mixed contract that was predominantly for services. The considerations include the "sophistication of the parties," the "commercial nature of the transaction," and the "representation of the parties by counsel." *Id.,* ¶¶ 28–29. The majority appears to conclude that, given the presence of these considerations here, this case is "tailor made" for the economic loss doctrine. *Id.,* ¶ 28.

¶ 80. That the majority is expanding the doctrine is then made clear by its selective application of the *Linden* factors to the facts of this case. Under *Linden,* the predominant purpose test is a fact-intensive one, requiring a "totality of the circumstances" inquiry into "both quantitatively objective and subjective factors." *Linden,* 283 Wis. 2d 606, ¶ 18. In applying the test, the court is to consider these factors:

---

when there was "no contractual relationship of any kind between two parties" and distinguishing *Linden* as a case involving "vertical privity").

(1) the language of the contract;

(2) the nature of the business of the supplier;

(3) the intrinsic worth of the materials;

(4) the circumstances of the parties; and

(5) the primary objective they hoped to achieve by entering into the contract.

*Id.,* ¶ 21. Let us examine the majority's application of these factors.

¶ 81. In applying the first factor, the majority acknowledges that "under the plain language of the contract, 'The Project' was the '[r]enovation of a warehouse into a 42–unit condominium and construction of adjacent parking garages." Majority op., ¶ 46. It concludes that the predominant purpose of the contract was either to "construct" or to "provide" a "condominium complex." *Id.,* ¶¶ 5, 50. The majority is apparently confident that this type of renovation of an existing structure constitutes a product, not a service. Under the majority's logic I wonder when, if ever, a contract for the renovation of an existing structure will be something other than a contract that is predominantly for a product.

¶ 82. The majority then analyzes the "pricing of the contract," the "process of bidding" for the contract, and "1325's understanding of the contract," selectively focusing on portions of the record that arguably support its analysis. *Id.,* ¶¶ 47–49. These may be relevant considerations in a predominant purposes analysis under *Linden.* However, the majority opinion leaves unclear, at best, whether it has applied the "nature of the business of the supplier" factor or the "the intrinsic worth of the materials" factor.

¶ 83. What is the nature of T-3's business? The majority does not tell us.

453

¶ 84. What is the intrinsic worth of the materials used in the renovation project? The majority does not say.

¶ 85. Similarly, the majority gives short shrift to the "circumstances of the parties" factor, the amorphous catch-all factor under *Linden*.

¶ 86. Indeed, despite the fact-intensive nature of the *Linden* test, and despite the voluminous record in this case, the majority needs only four modest paragraphs to complete its totality of the circumstances inquiry under *Linden*. *See* majority op., ¶¶ 46–49. This is hardly surprising because if the majority faithfully applied all the *Linden* factors, then it would be unable to find for T-3. Instead, the majority selectively applies the highly malleable *Linden* factors to achieve its intended result.

¶ 87. As revealed by a footnote in the majority opinion, the majority may be re-interpreting the *Linden* test. Lest the reader think I exaggerate, I will allow the majority's opinion to speak for itself:

> In *Linden,* we collected these factors from other jurisdictions as examples of what other courts had looked at in determining the predominant purpose of a contract. However, we focused our attention primarily on two factors—the primary objective the parties hoped to achieve and the fixed contract price—in concluding that the contract was primarily for the construction of a house. *Linden,* 283 Wis. 2d 606, ¶ 25.

Majority op., ¶ 42 n.11.

¶ 88. Is the majority now suggesting that *Linden* is really a two-factor test? Litigants in Wisconsin will be left to guess until the next time the majority has the opportunity to re-interpret *Linden*.

¶ 89. It should not be overlooked that this case comes to us on summary judgment. Before applying the

economic loss doctrine, the majority should be reviewing the facts presented in the light most favorable to 1325. *See* majority op., ¶ 22. What does the majority do instead? It selects facts from the record that are favorable to T-3, seeming to construe reasonable inferences in the wrong direction. In this way, the majority concludes as a matter of law that the predominant purpose of 1325's contract with T-3 was to provide a product.[7]

¶ 90. For example, the majority is highly persuaded by T-3's argument that only $176,000 of the nearly $6.1 million contract price was for "construction management services." Majority op., ¶ 47. The rest, T-3 argues, was for "physical improvements to the building." In accepting this argument, the majority ignores the most reasonable inference: that the cost of these "improvements" must have included the extensive services necessary to make them.

¶ 91. The list of "improvements" to which the majority is referring includes the following:

| | |
|---|---|
| General Conditions | $290,000.00 |
| Sitework | $250,000.00 |
| Finishes | $1,300,000.00 |
| Specialties | $93,454.00 |
| Contingency | $200,000.00 |

¶ 92. Is the only reasonable inference on the record before us that the $1.3 million for "Finishes" was a cost primarily for a product? This is the type of question the majority dare not answer.

---

[7] This is not the first time that the same majority of this court has jettisoned the requirements of summary judgment methodology as a means to achieve its economic loss doctrine ends. *See Grams,* 283 Wis. 2d 511, ¶¶ 92–97 (Abrahamson, C. J., dissenting).

¶ 93. Unlike the majority, the unanimous court of appeals provided a fair and more balanced description of the contract in this case: "Essentially, T-3 was to provide professional construction management services and hire subcontractors to renovate the building and complete the project." *1325 North Van Buren, LLC v. T-3 Group, Ltd.*, 2005 WI App 121, ¶ 3, 284 Wis. 2d 387, 701 N.W.2d 13.

¶ 94. Based on its description of the contract, the court of appeals declined to apply the predominant purpose test, rejecting T-3's argument that the contract could be characterized even as mixed. *Id.*, ¶ 20 n.6. It concluded that the contract was one for services and not for a product. *Id.*, ¶ 14.[8] The majority's conclusion stands in stark contrast.

¶ 95. In the end, the majority's initial focus on considerations that apply to all commercial parties and its faint-hearted application of the *Linden* factors demonstrate two things: the difficulty in applying the *Linden* test and the majority's willingness to use the test's malleability in order to further expand the economic loss doctrine beyond the doctrine's principled origins. Reaching well beyond what *Linden* dictates, it now applies the economic loss doctrine to a contract that is predominantly for a service.

III

¶ 96. One year ago, in *Linden,* I lamented:

> Perhaps a day will come when this court will rein in this recent evolution of the economic loss doctrine and

---

[8] The court of appeals issued its decision before this court issued *Linden.* It declined, however, to reconsider its decision in light of *Linden.*

'return to the doctrine's principled roots.' . . . Unfortunately . . . that day is not today.

*Linden,* 283 Wis. 2d 606, ¶ 65 (Bradley, J., dissenting) (footnote omitted). Sadly for Wisconsin, that day is not today either.

¶ 97. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice LOUIS B. BUTLER, JR. join this dissent.